## Campbell and Others' Appeal.

1. A wife executed post-nuptial settlements with her husband; after his death she elected not to take under his will, claiming her rights under the intestate laws. She filed a bill against his executors averring that the agreements had been procured by fraud, &c., and praying they might be delivered up to be cancelled: *Held*, that the Common Pleas had jurisdiction.

2. Equity exercises its appropriate function when it removes out of the way of the Orphans' Court an obstruction which would hinder or delay distribution.

3. If the wife had proceeded in the Orphans' Court for the recovery of her share of the estate and the settlement had been set up as a bar, that court would have taken jurisdiction, as a consequence of its jurisdiction over the distribution; but the Common Pleas might exercise jurisdiction over the particular question before the Orphans' Court's jurisdiction had attached.

4. Marriage suspends the capacity of the wife to contract, living the husband; she is wholly incompetent to contract independently of him. *Per* Thompson (*late C. J.*), *Master.*

5. Whether a wife can have relief against a post-nuptial settlement, depends much on the nature and value of the interest parted with by her as a consideration. *Id.*

6. Without an actual execution of a post-nuptial settlement by the irrevocable transfer of the property settled, the wife will not be bound; she is never bound by a mere promissory consideration. *Id.*

7. By relinquishing the provisions in the settlement without having received any benefit under it, the wife leaves her husband's estate and herself in *statu quo*. *Id.*

8. It is only on equitable grounds by way of estoppel, that her contract will bind her; and such elements of equitable estoppel as would result in injury to some one interested, must appear. *Id.*

9. A post-nuptial settlement will not operate as an election unless under special circumstances; it can take place only when the right of choice is coeval with the right of dominion; that must be after the husband's death. *Id.*

10. A false paper assuming to be a contract binds no one but the party getting it up. *Id.*

11. A post-nuptial contract to be binding under the most favorable circumstances must in every way be fair and unexceptionable on equitable grounds. *Id.*

12. If a post-nuptial contract be unfavorable to the wife; if it may be inferred that undue influence or the smallest amount of coercion has been used; if the mode appointed by law to ascertain her consent in order to negative all idea of coercion, has been omitted; equity will relieve against the contract and remit her to her rights under the intestate laws. *Id.*

13. If the state of facts would shock a chancellor's conscience, he would relieve against an ante-nuptial or any other contract. *Id.*

14. Dundas's Appeal, 23 P. F. Smith 474; Linsenbigler *v.* Gourley, 6 P. F. Smith 166, distinguished; Souder's Appeal, 7 P. F. Smith 498, recognised.

[Campbell's Appeal.]

January 10th 1876. Before AGNEW, C. J., SHARSWOOD, MERCUR, GORDON, PAXSON and WOODWARD, JJ.

Appeal from the decree at Nisi Prius: Of January Term 1873, No. 36.

On the 12th of March 1873, Robenia Hammett filed a bill against James H. Campbell and others, executors, &c., of Barnabas Hammett, deceased; James H. Campbell and another, trustees under said will, of Elizabeth F. Hammett, the Fidelity Insurance Trust and Safe Deposit Company, guardians, &c., of Frederick W. Hammett and others, minor children of said deceased.

The plaintiff was married to the decedent on the 22d of February 1868; on the same day, some hours after the marriage, she executed a paper signed by her with her maiden name; the paper was lost, but its contents were proved to be as follows:—

"For a valuable consideration to me in hand paid, the receipt of which I hereby acknowledge, I hereby relinquish my right of dower, and agree to accept in lieu thereof such provision as Mr. Barnabas Hammett may make for my support, it being understood that he is to provide for the expenses of the house, as long as the children remain under my care."

She afterwards executed the following paper:—

"Agreement made November 29th 1869, between Barnabas Hammett and Robenia E. Hardie (now Robenia Hammett), and James H. Campbell.

"Whereas, The said Barnabas Hammett and Robenia Hammett, his wife, late Robenia E. Hardie, were married February 22d, A. D. 1867, and the said Robenia E. Hardie and Barnabas Hammett then executed a certain contract whereby he, in consideration of her release of all her right, interest, and claim of dower, distributive share or otherwise, in his real or personal estate to him, and of said then contemplated marriage, covenanted and agreed that she should receive in lieu thereof out of his estate, upon his death and thereafter during her life, annually, the sum of $1200, being the interest on $20,000; and she, in consideration of said covenant and agreement on his part and of said then contemplated marriage, released and for ever quit claimed to him, his heirs, executors, administrators and assigns, all her right, title, interest, claim and demand of dower, distributive share or otherwise of, in and to his real and personal estate, in full satisfaction and bar thereof, except said annuity; and whereas, the said contract has been lost, now this agreement witnesseth:—

" 1. That the said parties hereto agree, declare and witness that the contents of the said lost contract are correctly above set forth.

" 2. That the said Barnabas Hammett and Robenia Hammett, his wife, and James H. Campbell, acting as trustee on behalf of

[Campbell's Appeal.]

said Robenia Hammett, hereby confirm the said contract and the covenants, agreements and release therein above recited; and the said Robenia Hammett, through James H. Campbell, her trustee for that purpose, and her said trustee on her behalf, release and forever quit claim hereby all her right, title, interest, claim and demand of dower, distributive share or otherwise, of, in and to the real and personal estate of Barnabas Hammett, to him, his heirs, executors, administrators, assigns, except said annuity; and the said Barnabas Hammett hereby covenants and agrees with the said James H. Campbell, trustee on behalf of said Robenia Hammett, that she shall receive out of said Barnabas Hammett's estate, upon his death and thereafter during her life, annually, the sum of $1200, being the interest of $20,000.

"Witness our hands and seals the day and year first aforesaid.

|  |  |
|---|---|
| B. HAMMETT, | [SEAL.] |
| ROBENIA HAMMETT, | [SEAL.] |
| JAMES H. CAMPBELL, | [SEAL.] |

"Witness—JAMES NEILL,
ALEX. T. WILSON."

The decedent died January 22d 1873, leaving a will dated December 16th 1872, and proved the 27th of the same month.

The clause next following the formal clauses was :—

"Item. Inasmuch as I have heretofore made and executed a marriage settlement in favor of my dear wife Robenia which I deem ample for her comfortable maintenance and support, I have not made any other provision for her in or under this my will."

He gave to Daniel M. Fox, $8333.33 in trust for his daughter, Elizabeth F. Hammett, and gave the residue of his estate to "all (his) children," naming eight, amongst whom was Elizabeth F., her share in the residue to be held in trust by Mr. Fox.

He named his wife, James H. Campbell, Daniel M. Fox and N. B. Browne, executors of his will. Mrs. Hammett renounced and letters testamentary were granted to the other three executors.

On the 15th of February 1873, Mrs. Hammett notified the executors that she had not executed any marriage settlement before marriage; that the paper referred to as such in the will was executed after marriage when she was not competent to execute it and that she was ignorant of its contents and legal effect; that for these and other reasons, neither that paper nor any other was binding on her. She notified the executors also that she elected not to accept any bequest or provision of the will in her favor nor in any paper referred to in it; but elected to take her dower in the estate of the testator, and her share in the personal estate and all other rights to which she was entitled under the intestate laws of Pennsylvania.

The Fidelity Insurance Company were afterwards appointed guardians, &c., of the testator's seven minor children.

The bill set out:—

1. Complainant was married to Barnabas Hammett on the morning of 22d February 1868. Several hours after, on the same day, she was induced to sign some paper in her maiden name, the contents of which she did not understand, by which defendants claim that she agreed to relinquish her right to dower in the estate of her husband, and accept in lieu thereof what he should by will bequeath for her maintenance, after his decease, or some other bequest in her favor, of which she was not informed.

2. Said paper was not signed in consideration of marriage, but after marriage, and without consideration, which plaintiff is assured was a fraud upon her rights and void.

3, 4. On the 29th of November 1869, she was induced to sign another paper (referring to its contents). The contents of this agreement were not made known to her before its execution, but fraudulently concealed from her by her husband; and the recitals therein contained were untrue.

5, 6. Death of Barnabas Hammett, leaving a will; the appointment of the executors, and also the guardians of seven of testator's children; also averring that Mr. Campbell was not appointed or designated as trustee for the plaintiff by her, or authorized so to act for her; but the plaintiff is well assured that Mr. Campbell knew nothing of the conduct of Mr. Hammett in withholding from her the knowledge of its contents.

7. Plaintiff's election, &c.

8. Since the death of Barnabas Hammett, defendants have set up that plaintiff is estopped from making such election by the said agreement of the 29th November 1869.

The prayers were:—

1. That the alleged agreement of 22d February 1868, be decreed to be void.

2. That the agreement of 29th November 1869, be decreed to be a fraud upon the plaintiff and void.

3. That the executors be decreed to surrender up the said agreement to be cancelled and destroyed.

4. That defendants be enjoined from setting up said agreements or any other to which the latter agreement refers, in bar of plaintiff's rights as widow of said Barnabas Hammett, under the intestate laws of the Commonwealth.

6. General relief.

Messrs. Fox and Browne by their answer admitted some of the averments of the bill, denied knowledge as to others, and required proof; the last paragraph of their answer was:—

" 9. Defendants insist that plaintiff cannot maintain this suit:—

"I. Because she is estopped in law from denying the facts recited, declared and witnessed by her, in the agreement of the 29th day of November 1869.

"II. The bill of complaint sets forth no matter or fact that would entitle the plaintiff to the relief in equity prayed."

Mr. Campbell answered separately, adopting the answer of the executors, and further saying: "He was informed and believed that the contents of the papers of 29th November 1869, were known to plaintiff, and being so informed he agreed to act as trustee and guardian in the execution of said agreement."

The late Chief Justice THOMPSON was appointed examiner and master; he reported the facts to be as follows:—

"The maiden name of the plaintiff was Robenia Hardie; her marriage with Mr. Hammett took place about nine o'clock, A. M., on the 22d of February 1868, in his house on Broad street, and in his bed-room; they were married by the Rev. James Neill, who was one of Mr. Hammett's partners. He was just recovering from an attack of spotted fever at the time, and being unable to stand, sat on the edge of the bed, partially dressed, during the ceremony. After it was performed, Mr. Neill, who was about leaving, was requested by Mr. Hammett to return in the afternoon, which he did, between four and five o'clock, P. M. When he returned, and in the absence of Mrs. Hammett, Mr. Hammett said he wished him to make a writing between him, Hammett, and his wife. He then took pen and paper, and Mr. Hammett dictated what he should write. 'I told him,' says Mr. Neill, 'that no paper was valid without a consideration.' This paper having been called for (and the answer of counsel for respondent being that they have it not), the witness, Mr. Neill, was offered to prove its contents, and proceeded, under objection, to state that it was, in substance, as follows: 'For a valuable consideration to me in hand paid, the receipt of which I hereby acknowledge, I hereby relinquish my right of dower and agree to accept in lieu thereof such provision as Mr. Barnabas Hammett may make for my support, it being understood that he is to provide for the expenses of the house as long as the children remain under my care.' This paper was signed, by the express directions of Mr. Hammett, by his wife, in her maiden name. The master finds that this agreement was made after the marriage of Robenia Hardie with Barnabas Hammett; that it is substantially given by the witness who wrote it, and that it was the only agreement between the parties prior to that of November 29th 1869; that it was a post-nuptial, and that no ante-nuptial settlement or agreement for any settlement, ever existed between the parties. After the paper was signed by Mrs. Hammett in her maiden name, Mr. Hammett took possession of it without affixing his signature to it, and it has not been seen by Mr. Neill nor any of the respondents representing Mr. Hammett since, but was afterwards, in the agreement of the 29th of November 1869, alleged to have been lost.

"The master further finds that this paper was wholly without

consideration passing at this time, and without even a promissory consideration. The furnishing maintenance for the children was only what the law bound him to do, and so as to his wife. No sum was fixed to be paid at any time, by the agreement, as a consideration for the relinquishment by Mrs. Hammett of her marital rights. It was signed without consultation with anybody by her, and at the command of her husband, and without information given her of the state of her husband's property, or what she was relinquishing. The law presumes all such acts in execution of written instruments by a married woman to be done under coercion, unless acknowledged according to law. There was no acknowledgment of the instrument in question. He finds that her signature was obtained by coercive control, from the testimony of the only witness present, who, in the the opinion of the master, is entirely reliable. He testifies that after he had finished writing the instrument, Mr. Hammett told him to call in Mrs. Hammett; that he did so, and when she came in and was told what she was wanted for, and the paper was read, she asked how she was to sign it. Mr. Hammett answered in a peremptory manner, and told her to sign her maiden name. The witness says she signed without saying a word, that she appeared to do it mechanically. ' Her manner appeared to be prompt obedience.' There is no doubt about the fact that this writing was executed by his wife at the command of Mr. Hammett, after the marriage of Mr. and Mrs. Hammett, and they lived together afterwards with all their children, until the death of Mr. Hammett, on the 22d day of January 1873.

" As to the agreement of the date of the 29th of November 1869, stated to be ' between Barnabas Hammett and Robenia H. Hardie, now Robenia Hammett, and James H. Campbell,' as it is headed, the master finds material misstatements and misrepresentations in the alleged facts set forth in the preamble to it, under the ' whereas' in the same, viz. : He finds that—

" 1st. No contract was executed antecedently to it between Barnabas Hammett and Robenia Hardie, whereby in consideration of her release of dower and distributive share, or otherwise, by the latter that she was to receive in lieu thereof out of the estate of the former, after his death, the sum of $1200 annually, being the interest of $20,000.

" 2d. The contract of 22d of February 1868, was not made in contemplation of marriage, but some hours after the marriage of the parties to it had been actually solemnized.

" 3d. The declaration in said agreement or writing that the contents of the ' said lost contract' are correctly set forth in the preamble to it, is not true, as is fully shown in the testimony of James Neill.

" In the last clause of the said agreement, the recital that James H. Campbell was acting as trustee in said contract in confirming

the 'contract and the covenants, agreements and release therein above recited' is untrue, both in law and fact. Mrs. Hammett, being a married woman, had no power by her own choice to appoint a trustee to contract for her. Mr. Campbell proves incontestibly, that Mrs. Hammett never spoke to, or in any way consulted him on the subject; that he acted alone at the request of Mr. Hammett, and on his representation that Mrs. Hammett knew all about it. The master also finds that so far as the agreement between Mr. Hammett and his wife, dated the 29th of November 1869, seeks to confirm a previous agreement, alleged to have been entered into between them, is concerned, it is void, for the reason that the same is mis-recited in all the material allegations in it; that no such instrument as that recited existed, and consequently was incapable of confirmation; that the instrument proved was itself void, being without consideration, and not legally executed by either of the parties to it.

"So far as the said agreement of 29th of November 1869, purports to be a new and independent contract of release by Mrs. Hammett of her dower and distributive share in and to the personal and real estate of her said husband, Barnabas Hammett, the master finds—

"That the contract was framed by the procurement and at the sole dictation of Hammett; that it was prepared by counsel at his instance alone, and not in the presence of his wife, or at her request; that Mr. Crawford, who wrote the agreement, left blanks in it, which were afterwards filled by Mr. Campbell, who was Mr. Hammett's general counsel, and were filled by direction of Mr. Hammett alone, including the proposed annuity of $1200 in the absence of Mrs. Hammett; that a few days after the filling of the blanks, Mr. Campbell was called upon to go to the alderman's office to execute the instrument, and he did so; that after a day or two the paper was put into Mr. Campbell's custody by Mr. Hammett, for safe-keeping, and so remained exclusively until after Mr. Hammett's death, three years and nearly two months. The master finds that the paper was not read to Mrs. Hammett by the counsel who drew it, nor was she informed of its contents by him, nor by the counsel for Mr. Hammett, who filled up the blanks, nor was it read to her at the alderman's office, as is proved by the witnesses present on the occasion, and by Mr. Campbell, and the alderman himself; the latter testifying that he did not recollect of reading it to her, that it was not customary to read papers to parties who called to have them acknowledged, unless requested to read them. Nor was she seen to read or look over it in the alderman's office. It lay on the table three-fourths folded, leaving open to view the end of it to which the signatures were to be appended. Not any of the witnesses to the instrument were made acquainted with its purport or contents at the time of attesting it. The master

does not infer from the manner in which the paper lay on the table, partly folded at the time of execution, that there was in that circumstance any intentional concealment of its contents. The place where it was executed was in the office or counting-room of Mr. Hammett, the witnesses coming there, as well as the alderman, for the purpose, and Mrs. Hammett being brought there by Mr. Hammett in a carriage.

" There is no positive testimony that the agreement was not read to or by Mrs. Hammett before signing. That is a negative not easily proved, and, in the opinion of the master, Mrs. Hammett was not a competent witness to testify to that fact, and what she did say on that point is excluded from consideration by the master. But he holds, that as all who had anything to do with the writing, either as scrivener, counsel, trustee and subscribing witnesses and alderman, prove that it was not read to her to their knowledge, which, taken together with its intended effect and operation upon her interests, being a release of all her marital rights in her husband's estate for an utterly inadequate consideration, raises a conclusive presumption in the absence of rebutting proof, that it was not read to her before signing. This view alone comports with the idea of sufficient contracting natural capacity on the part of Mrs. Hammett, a fact not denied to her by anybody, but rather a deficient sense of moral honesty on the part of her husband. The master thinks himself bound to find that Mrs. Hammett executed the paper in question in ignorance of its contents as affecting her interests. It appears that about this time, and up to his death, Mr. Hammett estimated his property and estate at between one and two millions of dollars, and it has been estimated by witnesses on this hearing at from seven to nine hundred thousand dollars at the time of his death, near three hundred thousand of which was personal property. Supposing him worth anything like either of these sums at the date of the contract, is it reasonable to suppose that Mrs. Hammett, possessed as she was of ordinary capacity, would have relinquished all that for the pittance stipulated to be paid her in the shape of an annuity of $1200 per annum for life ? It cannot be. If she was not kept in ignorance of her rights and the extent of her husband's property, there is but one way of accounting for her signing a relinquishment of her marital rights for the trifling sum mentioned, namely, that it was done under coercion by her husband, and this would be equally fatal to the validity of the agreement of the 29th November 1869. It requires the utmost good faith and the fullest information, with a disclosure of every essential fact necessary to intelligent action, to constitute such contracts between husband and wife valid and binding in equity, being utterly void at law. The master finds, therefore, that in view of the pecuniary circumstances of Mr. Hammett, the settlement upon his wife was totally inadequate as a suitable provision

30 P. F. SMITH—20

for her, her condition being regarded, or as a consideration for a relinquishment of her interest.as dower and distributive share in his personal estate, and that for this reason as well as for the misrepresentations and misstatements contained in the agreement of the 29th November 1869, it is void in equity as it unquestionably is at law, from want of capacity on the part of complainant to contract, being a *feme covert* at the time."

" It is an elementary principle that marriage suspends the capacity of the wife to contract, living the husband. From time to time the gererality of the rule has received limitations in this Commonwealth, to meet the demands of a change of policy on this subject, but the rule remains as firmly seated as ever where not modified by statute. The effect of it is, to render void contracts of married women within it, and is the logical sequence of the principle which holds that she is wholly without capacity to contract independently of her husband. It is not *qua* the individual that this results, but because as such she is destitute of the absolute essential to contract, namely, the power to contract. The rule is the necessary result of the relation, otherwise infinite confusion would ensue, from an equality of power in both husband and wife to contract during the existence of the marriage relation. The philosophy of the common law was too conservative to sanction such an incongruous state of affairs as this would present. It is beyond doubt, therefore, that contracts of married women are void unless preserved by some statutory provision : McQueen on Husband and Wife, 66 Law Lib. 271, 273, 281, *et seq.* ; Reeves Dom. Rel., p. 45, *et seq.* ; Glidden *v.* Strupler, 2 P. F. Smith 400 ; Walters *v.* Caldwell, 6 Harris 79 ; Brunner's Appeal, 11 Wright.67 ; Kreiser's Appeal, 19 P. F. Smith 194.

" Equity follows the law in this particular, unless equitable considerations in the given cause appear to modify the rule. For instance, where a post-nuptial settlement altogether fair and equitable, has been executed, and the gift to the wife' has passed to her (for post-nuptial settlements, strictly speaking, are mere gifts between husband and wife : Schoul. Dom. Rel. 276), she might in that case in equity be required to perform it; in other words, a chancellor would refuse to restore her to her rights relinquished in the settlement, after the death of the husband. It will depend much, therefore, upon the nature and value of the interest which has been parted with by the wife as a consideration for what she has received by way of settlement, whether or not she ought to be entitled to relief : Cord on Married Women, sec 35, *et seq.* The authorities, as also the reason of the thing, seem to teach that without an actual execution of a post-nuptial settlement by an irrevocable effectual transfer of the property settled,'the wife will not be bound if she does not choose, and is never bound by a mere

[Campbell's Appeal.]

promissory consideration.   I have not been able to find a single case in which a wife has been decreed to perform a post-nuptial executory contract at the instance of the representatives of her husband.   The wife, by relinquishing the provisions in the settlement, without having received any benefit under it, leaves her husband's estate in *statu quo*, and is remitted by virtue of her marital rights to the same condition.   It is only on equitable grounds her contract may be efficient to bind her, and then it is by way of estoppel.   But she will not be estopped unless elements of an equitable estoppel appear, which will result in injury to some one interested if she be not estopped.   Nor will a post-nuptial contract operate as an election unless under possible special circumstances. Election can take place only when the right of choice is coeval with the right of dominion, and that must be after the death of the husband.   With us, a year after the death of the husband is allowed the widow, to elect between a testamentary provision, and her rights under the intestate laws : Act of March 29th 1832, sect. 35, Pamph. L. 200, 1 Br. Purd. 529, pl. 6.

"These are positions all applicable to the case under consideration.   Mrs. Hammett, immediately after the death of her husband, and on consulting counsel, relinquished her right of executorship and every other interest under the will of her husband, and notified the executors that she repudiated and refused to be bound by the alleged executory post-nuptial contracts with her husband.   She was not estopped to do so by any element of equitable estoppel, such as having taken a benefit under the agreement, or subjected it to injury.   For the elements of estoppel, see Commonwealth *v.* Moltz, 10 Barr 527.   There must be an injury of which some one can complain : Hepburn *v.* McDowell, 17 S. & R. 383, and many recent cases to the same effect.   The legatees under the will of Mr. Hammett cannot complain ; they are mere volunteers and not purchasers for value.   Nor is she estopped on the principle of election, for she was as incapable of electing at the date of alleged settlement as she was to contract.   The agreement never was intended to operate in that direction, and if it had been, no court could sustain it in its total inadequacy of consideration.   I regard this as an answer to the claim of plaintiff as wholly inadmissible. Kreiser's Appeal, 19 P. F. Smith 194, settles all these points in favor of the plaintiff thus far.   See also Frank *v.* Frank, 3 Myl. & Cr. 178, 181.   According to the principles stated in the outset of this report, the alleged contracts relied on by respondent, having no equitable considerations to sustain them, are mere naked contracts, and do not bind the plaintiff, she having chosen to repudiate them.

"But even if the foregoing positions be not tenable, how does the present contract stand on the facts reported as found ?   Briefly, they are, that the first alleged contract was made after the mar-

[Campbell's Appeal.]

riage of the parties, without any consideration passing to the plaintiff for the relinquishment of her marital rights, or even promised her. The agreement was actually never signed by the parties purporting to contract. It was signed by plaintiff by direction of her husband in her maiden name, he not signing at all so far as can be ascertained now, and it never was acknowledged by her before a magistrate.

"A relinquishment by the plaintiff of all her interest in an estate of many hundreds of thousands of dollars, perhaps extending to more than a million of real and personal property, for I have no doubt that the word 'dower' was thought to cover all her interest in the estate, for a promise to make an indefinite provision for her in his will was a mere mockery, a farce!—worth nothing either in law or equity. But it was not even binding on the husband, for it is not shown that he ever signed it: of course it could not be binding on his wife. After this defective execution of the paper, Mr. Hammett took possession of it, and it has not been seen since; but he has made it the predicate of a new post-nuptial contract dated the 29th November 1869, in which its contents purported to be recited, but which are shown to be mis-recited in every essential particular by the writer of it.

"These misrepresentations being in essential particulars, so far as confirmation is concerned, render the attempted confirmation entirely nugatory, and this whether the misrepresentations proceeded from fraud or mistake. A false paper, assuming to be a contract, binds nobody but the party getting it up. All the testimony shows that the paper of the 29th November 1869, was drawn up in a blank at the dictation of Mr. Hammett alone, and in the absence of his wife, and the blanks afterwards filled up at his sole dictation. It was a gross misrepresentation to represent the first contract as an ante-nuptial agreement; it was not; and it was no less untrue to recite that it contained a stipulation for the payment of an annual sum of $1200 for life as a consideration for the release of dower by his wife. Even this pittance, equal to about $3.50 a day, to meet all the requirements of living, clothing and expenses in sickness and in health, was falsely recited, as the uncontradicted testimony of its writer shows. As confirmatory of the alleged lost paper this last paper is, in the master's opinion, utterly void.

"But the paper of the 29th November 1869 is relied on as an independent contract of settlement. To preserve it from the effect of being post-nuptial and not binding, there is a recital in it that there was a preceding ante-nuptial contract, which is alleged to have been lost. But there is no testimony of which this could be predicated. It is the other way. The only thing purporting to be a contract, is that of which I have been treating, which was drawn up on the 22d February 1868, and recited as lost. There

is not a shadow of proof to controvert the testimony that this paper was drawn and signed, so far as it had a signature to it, after the marriage of Hammett to his wife. The only evidence relied on is the recital in the last agreement that it was ante-nuptial. But this has been shown to be untrue by the scrivener who wrote it, and in no particular is his testimony impugned; on the contrary, it is supported by an additional witness, Mr. Balch. *Falsus in uno, falsus in omnibus*, is as applicable to it as a witness, as it would be to a living witness. The falsehood in essential particulars shows the source of information to be unreliable and fraudulent, unless accounted for. There was no attempt at this. The contract of the 29th November 1869, therefore, gathers no force as evidence of the execution of a pre-existing ante-nuptial contract.

"A contract between husband and wife, of the nature we are considering, in order to be binding, under the most favorable circumstances, must in every way be fair and unexceptionable on equitable grounds. The best of faith must be shown on the part of the husband. *Uberrima fides* is the requirement. If the contract be unfavorable to the wife; if it may be inferred that undue influence, or the smallest amount of coercion has been used; nay, if the mode appointed by the law to ascertain the wife's consent in order to negative all idea of coercion, has been omitted, viz. : an acknowledgment before a competent officer; if it appear that the contents of the contract, as well as the condition of the husband's estate, have not been made fully known to her, a court of equity will relieve against the contract and remit the wife to her rights under the intestate laws : Kreiser's Appeal, *supra*. If the provision made be grossly inadequate to the consideration released, a court of equity will relieve against an ante-nuptial, or any other contract. If the state of fact would shock a chancellor's conscience, he would regard the contract as void: Morse *v.* Royal, 12 Vesey 355 ; Story's Eq., sect. 267 ; Kline *v.* Kline, 7 P. F. Smith 120. In this last case, an ante-nuptial agreement was held void because of such an inadequate provision for the release by the woman of her marital rights as raised a presumption of fraud or undue influence, although the parties were then only betrothed. Much more might such a presumption arise when the relation is man and wife.

"It has been argued by respondent's counsel, with plausibility, at least, that the averment in plaintiff's bill, that the contents of the alleged agreement of the 29th November 1869, were not made known to plaintiff, but fraudulently concealed from her by her husband, has not been proved, as in equity they are required to be proved.

"The master has found that the instrument was not read to her before execution. After execution, it was taken possession of by Mr. Hammett, and delivered by him to his counsel, who deposited it for safe-keeping in a custody from whence it was never taken

till after his death. Positive evidence that the paper was not read to her is not possible to be given, without her testimony, which I have held was not competent in this case. But it is a fact inferable from circumstances, like any other fact. Where the usual and accustomed practice is omitted in the transaction of a particular business, it is not a harsh presumption to infer that the omission has had an object in view. In contracting it is usual and common for the contracting parties, on both sides, to appear before the scrivener and give him the substance of the contract to be reduced to writing, and if it happened that but one appear, then for the scrivener to prepare and read the instrument to the absent party. Here the paper was drawn by counsel at the dictation of Hammett alone, in the absence of his wife, whom the scrivener never saw during the preparation of it, and he never read it to her afterwards; there were blanks left in it, which were afterwards filled up by another; also Mr. Hammett's counsel, who is named in it as trustee, without the presence of Mrs. Hammett, and he never read it to her or informed her of its contents, because, as he says, he supposed she knew all about it. The witnesses who were called to attest its execution, say it was not read in their presence before execution, and even the alderman who took her acknowledgment, and certified that the contents of the instrument were fully made known to her by him, testifies that he did not read it to her, that it was not his duty to do so unless requested. Add to this the internal evidence afforded by the contract itself, the relinquishment by Mrs. Hammett of her rights in the event of the death of her husband, of nearly $100,000, which would be her distributive share in his personal estate, and dower in from a half to a million of real estate, largely productive, for an annuity of $1200 a year for life, to take effect after his death, raises an overwhelming presumption, I think, that it was signed in ignorance of its contents by Mrs. Hammett, which should stand for proof until rebutted. Under the rule in equity, I regard, therefore, these circumstances, together with the misrepresentations in regard to the first alleged agreement in the second, as evidence, not only that the instrument was not made known to the complainant, but that she was fraudulently kept in ignorance thereof before execution, and that she had not access to it, after its execution, until after the death of her husband. It is difficult to believe that anything but ignorance or coercion could have induced her to sign such an agreement. It will be remembered that this agreement was post-nuptial and is not to be accounted for from the precedent relations of the parties, as might possibly have been inferred from a somewhat inadequate provision made for the wife before the marriage. The marriage was in accordance with Mr. Hammett's own choice and in no way enforced upon him, and it stands before the court as every other voluntary assumption of the marriage relation.

[Campbell's Appeal.]

In this view, also, seeing that the contract was manifestly unequal and unjust to the wife, she ought not to be bound by it and it ought to be declared null and void.

" The only object of the plaintiff's bill is the setting aside of the alleged agreements or writings referred to. The prayer that the defendants, the executors, be required to transfer and pay over to the plaintiff her distributive share in the personal estate of her husband, was withdrawn and disclaimed on argument, by the counsel for the plaintiff, and is no longer in the case. Indeed, that belongs exclusively to the jurisdiction of the Orphans' Court.

" It was furthermore contended by respondents' counsel that the subject-matter of the entire bill was exclusively within the jurisdiction of the Orphans' Court. This has received much consideration from the master, and he has arrived at a different conclusion from the learned counsel. The bill interferes in no measure with the administration of the estate of the decedent in the Orphans' Court, nor does it operate on the person or personal rights of any of the distributees or legatees under the will of Mr. Hammett. It is probable the amounts to be distributed may be affected as a consequence of a decision under the bill, favorable to the plaintiff, but the same result would follow a successful attack on the testimony afforded by the agreements in the Orphans' Court. The difference is that it is more conveniently tried in equity than in that court. The contest is settled by one process, in the former jurisdiction, while in the latter, many contests over the same thing may be required. The prevention of multiplicity of suits is a distinct and most valuable head of equitable jurisdiction. Another head is, fraud, accident or mistake—the reformation or setting aside of contracts in which these elements exist. Both these heads sustain the plaintiff's bill. It does not, in the least, infringe upon the jurisdiction of the Orphans' Court ; it is a proceeding entirely collateral to that of distribution in that court. In my judgment, these views do not conflict in the least with Dundas's Appeal, 23 P. F. Smith 474, or Linsenbigler v. Gourley, 6 Id. 166, cited by respondents' counsel. Even if the Orphans' Court could entertain a bill and decree the invalidity of a contract and set it altogether aside, it does so as a court of equity. It is the exercise of concurrent jurisdiction, and in cases of concurrent jurisdiction, that court which has first taken jurisdiction will be allowed to proceed to a complete exercise thereof.

" Being of opinion, after a careful consideration of all the facts, as well as the law arising thereon, in this case, that the alleged agreement of the 22d February 1867 was a nullity from the beginning, and that the contract of the 29th November 1869, is void for the reasons stated in this report, the master recommends that a decree be made by the court:—

" ' That the agreement or paper writing referred to in the first

and second paragraphs of the plaintiff's bill and supposed to bear date the 22d of February A. D. 1868, is null and utterly void and of none effect as to any party or parties named therein, and is to be delivered up to the plaintiff to be cancelled or destroyed, if found; and that the agreement dated the 29th November A. D. 1869, executed by the signatures of Barnabas Hammett and Robenia Hammett, is also null and void and of none effect as an agreement between the parties to it or any others in succession to the covenants therein contained, and that the same be delivered up to be cancelled; and that defendants pay the costs of the suit.' "

Twenty-four exceptions were filed to the report of the master; they were overruled by the court at Nisi Prius, the report was confirmed and the decree recommended by the master made.

The defendants appealed to the court in banc.

They assigned for error, the sustaining the master's report, entering a decree for the plaintiff and overruling the exceptions to the master's report.

*G. Bull* and *H. M. Phillips* (with whom was *J. H. Campbell, p. p.*), for appellants.—A settlement made after marriage will be valid, if it is in pursuance of an ante-nuptial agreement: Ramsden *v.* Hylton, 2 Vesey, Sr. 208; Crookes *v.* Mescall, 2 Vernon 200. An agreement prior to marriage, reduced to writing and executed after the marriage, would be binding upon the wife, because the first agreement would not be extinguished by the marriage: Pridgeon *v.* Executors, Ch. Ca. 117; Reeves's Domestic Relations 176; MacQueen on Husband and Wife 275, note; Bright's Husband and Wife 112. A wife may, in Pennsylvania, contract with her husband, as with a stranger, provided the contract is supported by a sufficient consideration. Such a contract is subject to the same rules that would apply to one between strangers: McKennan *v.* Phillips, 6 Whart. 576; Duffy *v.* Ins. Co., 8 W. & S. 433; Precedents in Chancery 425. The plaintiff is estopped from denying the truth of the recital in the agreement: Lainson *v.* Tremere, 1 Ad. & E. 792; Bowman *v.* Taylor, 2 Id. 278. Whenever the recital is material and intended by the parties to fix the status of a fact, they are estopped from denying the truth thereof: Horton *v.* Commissioners, 7 Exch. 780; Hill *v.* Manchester, 2 B. & Ad. 544; Shelley *v.* Wright, Willes 9; Stronghill *v.* Buck, 14 Q. B. 781; Parker *v.* Smith, 17 Mass. 413; Freeman *v.* Auld, 44 N. Y. 50; Cutler *v.* Bower, 11 Q. B. 973; Hill *v.* Laming, 9 Exch. 256; Cutler *v.* Dickinson, 8 Pick. 386; Bruce *v.* United States, 17 How. 437; Shroyer *v.* Richmond, 16 Ohio St. 455; Ballou *v.* Jones, 37 Ill. 95; Dundas *v.* Hitchcock, 12 How. 256. A settlement is often made for the purpose of barring a portion only of the wife's right of survivorship: Clancy on Married Women 101 102; 1 Roper on Husband and Wife 285. The Orphans' Court

has the exclusive jurisdiction : Linsenbigler *v.* Gourley, 6 P. F. Smith 166 ; Dundas's Appeal, 23 Id. 474.

*Porter* (with whom was *W. D. Allen*), for appellee.—A jointure is sometimes settled upon a wife after marriage, in performance of articles of agreement entered into *before marriage.* If a jointure be settled upon the wife *after marriage,* without such previous articles, it can have no effect to bar her of her ·dower, unless she elects to have it so, after the death of her husband. Being at the time of the settlement of the jointure, as it is said, under the presumed coercion of her husband, she is not bound by the contract, but may resort to her dower. If she elect to take the jointure after the death of her husband, she shall then be barred of her dower, for she cannot have both : Reeves's Domestic Relations 45 ; ·MacQueen on Husband and Wife, 66 Law Lib. 273. The husband's post-nuptial settlement cannot bar the legal claim of his wife by survivorship : Lanoy *v.* Duke of Atholl, 2 Atk. 444 ; MacQueen 280, 281, note. Considering the relation between man and wife, and the opportunities which he has of practising upon her affection and fears, the law throws around her a protection, and disables her from contracting personally with him relative to her property, except according to the forms which it has prescribed : 1 Roper on Husband and Wife 305. If the jointure be made after the marriage, the wife may waive it and claim her dower : Peachey on Marriage Settlements 355. She will not be permitted to take both provisions, but will be compelled to elect between them ; Id. 367 ; Power *v.* Shiel, 1 Molloy's Irish Chan. Cas. 296 ; Statute 27 Henry VIII., ch. 10, Statute of Uses ; Roberts's Digest 409, sect. 9 ; Peachey on Marriage Settlements 368 ; Frank *v.* Frank, 3 Myl. & Cr. 171. Whenever a voluntary settlement, made between husband and wife, is questioned, the party seeking to uphold the settlement is bound to prove that the transaction was righteous and that the donor voluntarily and deliberately did the act knowing its nature and effect : Cooke *v.* Lamotte, 15 Beav. 234 ; Phillipson *v.* Kerry, 32 Id. 628 ; Wollaston *v.* Tribe, Law Rep. 9 Eq. 44 ; Coutts *v.* Ackworth, 8 Id. 558 ; Hall *v.* Hall, 14 Id. 365 ; Phillips *v.* Mullings, Law Rep. 7 Ch. App. 244. A settlement made after ·marriage will not be enforced against the wife or her legal representatives, where she dissented from it during the coverture or after its termination : Kline *v.* Kline, 7 P. F. Smith 120. A party is not bound to make an election until all the circumstances and the state, condition and value of the fund are known : Kreiser's Appeal, 19 P. F. Smith 194. Except in few instances a married woman cannot execute a contract of any kind : Dorrance *v.* Scott, 3 Whart. 313 ; Glyde *v.* Keister, 8 Casey 88 ; Heugh *v.* Jones, Id. 432 ; Keen *v.* Coleman, 3 Wright 299 ; Keiper *v.* Helfricker, 6 Id. 325 ; Steinman *v.* Ewing, 7 Id. 63 ;

[Campbell's Appeal.]

Thorndell *v.* Morrison, 1 Casey 326 ; Stoops *v.* Blackford, 3 Id.
213; Richards *v.* McClellan, 5 Id. 385; Pettit *v.* Fretz, 9 Id.
118 ; Glidden *v.* Strupler, 2 P. F. Smith 400. This case is within
the jurisdiction of equity—(1) On the ground of fraud. Fraud is,
perhaps, of all others, the best known subject of equity jurisdic-
tion, as it would naturally be the most common subject of complaint
in administering a system of equity. The Act of June 13th 1840,
Pamph. L. 671, 1 Br. Purd. 591, pl. 3, expressly extends the
equity jurisdiction of our courts " to all cases arising in said city
and county over which courts of chancery entertain jurisdiction
on the grounds of *fraud,* accident, mistake or account." Many
of the cases which have been decided relate to marriage settlements
alleged to have been void on the ground of fraud or by reason of
the ignorance of one party or the other of the contents of such
settlements or the omission of some provision which should have·
been inserted : Cooke· *v.* Lamotte, 15 Beav. 234; Huguenin *v.*
Baseley, 14 Vesey 293 ; Phillipson *v.* Kerry, 32 Beav. 628; Nan-
nery *v.* Williams, 22 Id. 452 ; Wollaston *v.* Tribe, Law Rep. 9 Eq.
44; Phillips *v.* Mullings, Eq. Rep. 6 (May 1872),·247 ; Forshaw
*v.* Welsby, 30 Beav. 243; Coutts *v.* Ackworth, Law Rep. 8 Eq.
558; Hall *v.* Hall, 14 Id. 365. (2) She can maintain this bill to
prevent a multiplicity of actions at law : Bank of Kentucky *v.*
Schuylkill Bank, 1 Parsons 181 ; Hawley *v.* Kramer, 4 Cowen
727 ; Swame *v.* Perine, 5 Johns. Ch. Rep. 482. The Orphans'
Court has not jurisdiction of the claim of dower by a widow who
refuses to take under her former husband's will : Shaffer *v.* Shaffer,
14 Wright 394; Thomas *v.* Simpson, 3 Barr 68. Nor to assign
*to* a widow common-law dower in any case; jurisdiction over such
actions belongs exclusively to the common-law courts : Bradford's
*v.* Kents, 7 Wright 474; 1 Story's Equity Jurisprudence, sect.
628.                          •

Judgment was entered in the Supreme Court, January 17th
1876,

PER CURIAM.—This case has been so well developed, and so
clearly stated by the distinguished master, the late Chief Justice
THOMPSON, that nothing is left to be said upon the merits. The
marriage settlement was clearly post-nuptial, and most probably
was dictated by Mr. Hammett himself. ·The second writing mis-
recited the first in important particulars. We think Mrs. Hammett
was not bound by either.

We concur with the master that the Court of Common Pleas
had jurisdiction of this bill. It involved no question of settlement
and did not touch the estate of Mr. Hammett, except in its conse-
quences, as the consequence may attend any other proceeding or
action in the Common Pleas. Its purpose was merely to set aside
an instrument unduly obtained, injurious to the rights of the party.
It is true the cancellation of the paper affects the measure of dis-

[Campbell's Appeal.]

tribution, by removing the evidence of a fact, which, if suffered to be proved, would enter into the question of distribution.   But this is no more than would follow the death of a witness or his conviction of an infamous crime, or a claim of title for or against the estate enjoined by a decree.   On the contrary, equity exercises its most appropriate function here, when it removes out of the way of the Orphans' Court an obstruction constantly occurring to hinder or delay distribution.   The case of Dundas's Appeal, 23 P. _ F. Smith 474, and Linsenbigler v. Gourley, 6 P. F. Smith 166, do not touch the point now before us.   Dundas's Appeal rested on the fact that it was a proceeding, in distribution, for a share of the estate, where the Orphans' Court necessarily must take jurisdiction of the question of ownership of its share in order to remove it out of the way of a decree; as in Souder's Appeal, 7 P. F. Smith 498.   If Mrs. Hammett had proceeded in the Orphans' Court for the recovery of her share of the estate, and the postnuptial marriage settlement had been set up as a bar, the Orphans' Court would have taken jurisdiction of the question as a necessary consequence of its rightful jurisdiction over the distribution of the estate.   But this is no objection to the exercise of the jurisdiction of the Common Pleas over this particular question, as within a head of equity not forbidden by law, and before jurisdiction of the Orphans' Court had attached.   The decree itself shows that no matter of settlement or touching the administration of the estate was drawn within the power of the Common Pleas.   No power of the Orphans' Court was trenched upon.   It therefore does not conflict with the statement in Linsenbigler v. Gourley.

Decree affirmed, with costs to be paid out of the estate of B. Hammett, and appeal dismissed.