H. M. HALL, WIDOWER OF RACHEL ANNIE HALL, DECEASED, APPELLANT, v. S. D. GREENWELL, EXECUTOR OF THE ESTATE OF RACHEL ANNIE HALL, DECEASED, RESPONDENT.—85 S. W. (2d) 150.

St. Louis Court of Appeals. Opinion filed July 16, 1935.

Appellant's Motion for a Rehearing Overruled September 10, 1935.

Petition for Writ of Certiorari Denied by Supreme Court November 20, 1935.

*Claude R. Ball* and *Gilbert Weiss* for appellant.

1096

*Glover E. Dowell* for respondent.

BECKER, J.—H. M. Hall filed his application for statutory allowance of $400 as the widower of Rachel Annie Hall, deceased, under the provisions of Sec. 108, Revised Statutes of Missouri 1929 (Mo. Stat. Ann., sec. 108, p. 70), in the probate court of Montgomery County, Missouri. The judge of said probate court being a witness in the case, the matter was certified for hearing to the Circuit Court of said county. Upon a hearing judgment resulted in favor of the estate and plaintiff Hall in due course appeals.

The appellant H. M. Hall, married Rachel Annie Greenwell on November 14, 1895, and she remained his wife up to her death on December 1, 1933, at the asylum at Fulton, Missouri, where she had been confined continuously since September 8, 1922, on which date she had been adjudged of unsound mind. There were no children born of their marriage.

The record discloses that the following agreement had been entered into between the husband and wife:

"This agreement made and entered into this 31st day of October, 1921, by and between H. M. Hall, hereinafter designated as the husband, and Rachel Annie Hall, hereinafter designated as the wife, Witnesseth:

"Whereas, the parties hereto on the 14th day of November, 1894, were lawfully married to each other and since said date have lived together as husband and wife; and,

"Whereas, at the time of said marriage the wife was possessed in her own right of certain real estate situated in Montgomery County, Missouri, which she had acquired by deed, and the husband at the time of said marriage purchased certain other lands, and the lands belonging to the husband and the wife were thrown together as one farm and the husband and wife lived thereon, and in the year 1919, the husband and wife sold the lands belonging to both the husband and the wife and divided the proceeds of the sale of said lands in proportion to the interest of the husband and the wife in said lands, and

"Whereas the husband has used a part of his moneys in acquiring other real estate; the title to which is vested in the husband; and the wife has used a part of her moneys to acquire real estate, the title to which is vested in the wife, and

"Whereas, the husband is worth approximately from ten thousand to ten thousand two hundred and fifty dollars in money, notes and real estate; and

"Whereas, the wife is worth approximately between thirteen

thousand six hundred dollars and thirteen thousand seven hundred dollars in lands, money, government bonds; and

"Whereas the husband and wife are desirous of entering into a post-nuptial settlement of their property rights so that from henceforth there may be no dispute or misunderstanding as to the rights of the husband in the wife's property and the rights of the wife in the husband's property this agreement is entered into and conditioned as follows, to-wit:

"All of the property, both real and personal, owned by the husband shall be his own separate property at all times, free from the control or interference of the wife in any manner or by any means whatsoever, and the wife hereby expressly agrees that the husband may dispose of any real estate that he now owns, or may hereafter own, without the wife joining in the deed; the wife hereby expressly relinquishes any inchoate right of homestead, dower or any other marital rights that she may have in any real estate now owned by the husband, or which may hereafter be acquired by him, and it shall not be necessary for the husband to secure the wife's signature to the conveyance of any real estate, by him now owned, or which may be hereafter owned by him, but should the purchaser of any of the husband's real estate require the wife's signature to such conveyance the wife agrees she will freely join her husband in conveying any real estate which he now owns, or which he may hereafter own, upon request so to do.

"The wife further expressly relinquishes and releases unto the husband her homestead rights, inchoate right of dower, or any other marital rights that she may have in and to the real estate or personal property of the husband upon his death, and she consents that the husband may, if he so desires, make and execute his last will and testament devising and bequeathing his entire estate to whomsoever he may wish, and the wife agrees that she will not make any claims of any kind upon the husband's estate upon his death, and she further relinquishes her four hundred dollars absolute personal property allowed her upon the death of her husband, an allowance for a year's provisions and all other marital rights in not only the husband's real estate, but his personal property also. And in consideration of the wife releasing unto the husband all of her marital rights aforesaid in her husband's property, both before and after death, the husband does hereby relinquish and release unto the wife all homestead rights, dower rights, or other marital rights that he may have in and to any real estate she may now own, or may hereafter own, and he consents that she shall hold any real estate she now owns, or may hereafter acquire, free from the control of the husband in any way, so that the wife will be enabled to convey any real estate she may now own, or may hereafter acquire by deed without the

husband joining in such deed, but the husband consents and agrees that if the purchaser of the wife's real estate requires the signature of the husband to a conveyance of the wife's real estate that the husband will join in such conveyance. The husband hereby further relinquishes and releases unto the wife any and all right he may have by way of courtesy, homestead or dower, or other marital rights in any real estate of which the wife may die seized and possessed, and he further relinquishes and releases any and all marital rights that he may have in the wife's personal estate after her death, including a reasonable allowance for a year's support, the four hundred dollars absolute personal property allowed a widower upon the death of his wife, and all other marital rights he may have in the wife's estate.

"It being the primary object and intention of this instrument of writing and post-nuptial agreement for the husband and wife to so arrange their property rights and affairs so that during life each party hereto will be free to handle and deal with his or her separate and individual property the same as though the parties hereto were not married to each other but were single and unmarried, and so that upon the death of the wife the husband will not, and cannot, in any way, shape, manner or form participate in the distribution of the wife's estate, and so that on the other hand the wife cannot, and will not, upon the husband's death participate in the distribution of the husband's estate, and it being the further intention of this post-nuptial agreement to so arrange the property rights between the parties hereto so that upon the husband's death his property will descend to his next of kin by operation of law, unless he dies testate, and so that the wife will not have any interest therein, and likewise so that upon the death of the wife her property will descend to her next of kin by operation of law, unless the wife dies testate, and so that the husband will not in any possible way participate in the distribution of the wife's property after death.

"The parties hereto further agree that they shall carry a joint bank account in the New Florence Bank in the name of Mr. and Mrs. H. M. Hall, and out of their income of their separate property each party from time to time out of their income, and as may be necessary, shall deposit a like sum to this joint account, and this joint sum shall be used solely and exclusively for the necessaries of the husband and the wife, but each party hereto out of his or her income shall pay for their own wearing apparel and for their own doctor bills. The joint bank account herein provided for to be used solely for the purchase of necessaries for the support of the husband and the wife in their household affairs.

"Upon the death of either party should there be any money to the joint account of the parties hereto half of said joint bank account

shall be paid to the survivor and the other half shall be paid to the personal representatives of the deceased spouse.

"Neither party hereto shall be liable for the funeral expenses of the one who first departs this life, but the funeral expenses of the one first departing this life shall be paid out of the separate estate of the one so first dying.

"In witness whereof the parties have hereto set their hands and unto a duplicate copy hereof the day and year first above written.

"H. M. Hall.

"Rachel Annie Hall.

"Acknowledged before E. P. Rosenberger, notary public, October 31, 1921.

"In the Recorder's office: Filed October 31, 1921. Recorded in Book 110, page 292, at 5 o'clock P. M."

The case was heard upon the application for the allowance, no pleading being filed on behalf of the estate.

At the trial appellant introduced evidence showing that he was the widower of the deceased Rachel Annie Hall, and that her personal estate amounted to over $11,000, and rested. The defendant estate then offered in evidence the post-nuptial agreement dated October 31, 1921, set out *supra*. Plaintiff objected to the introduction of any evidence on the part of the estate on the ground that no pleading had been filed on its behalf. This objection was overruled, and plaintiff then objected to the introduction of the post-nuptial contract on the ground that it is an affirmative defense in this case without having been pleaded as such; that the contract has been procured by fraud; that the contract is incompetent for any purpose in the case because no consideration is shown therein; that the contract is against public policy because on its face it shows itself to be void because not binding on either party; and for the further reason that it is provided that the husband should not support the wife; that the wife should not support the husband; because the contract is testamentary in character and there is no jointure created by the contract; and because Mrs. Hall was insane on the date that the agreement was executed. These objections were overruled and the post-nuptial contract was introduced in evidence on behalf of the estate.

At the date of their marriage in 1895, Mrs. Hall owned 100 acres of land and Hall owned 86 acres of land adjoining. The improvements were on Hall's land. The couple lived there and farmed their lands together. Mrs. Hall had some mental disturbance prior to the time of her marriage but according to Hall such mental disturbance did not recur until some seven years after their marriage. The testimony as to her mental disturbance was that it occurred at intervals, at which times Mrs. Hall would manifest hallucinations and eccentrici-

ties; she would talk to herself; walk up and down looking at the sun or at night look at the moon, and make gestures. While several lay witnesses were adduced who testified that in their opinion during these mental disturbances she was insane, yet most of these witnesses who so testified, as well as all of the witnesses who had any business transactions with Mrs. Hall, testified that she was an exceptionally capable business woman, and that during the times of mental disturbances she would not transact any business.

In March, 1930, Hall and his wife sold all of their land to George Shumate for $16,500, and divided their property so that they each had an equal amount. According to Hall's own testimony "when straightened up we were within three dollars of each other . . . and we straightened up and each one had the right amount." In the property settlement Hall took an $8000 deed of trust upon all of the property which they had sold to Shumate. Mrs. Hall, with her part, purchased government bonds.

In September, 1930, Hall purchased what is referred to as a "little house back of Bush's store in New Florence" for $600—a two room frame building. The Halls moved into this property. When the Halls made their post-nuptial agreement on October 31, 1921, Mrs. Hall purchased from Hall the little frame house in New Florence which they were living in, paying him the sum of $600 in cash therefore. The post-nuptial agreement and the deed to this New Florence property were prepared by Emil P. Rosenberger, a practicing attorney of Montgomery City, Missouri. The acknowledgments of Hall and his wife to the instruments were taken by Rosenberger, and both instruments duly recorded in Montgomery County. Mrs. Hall on that same day executed her will in which she referred to the post-nuptial contract of even date and made her will in accordance with that contract, naming as her sole legatees two brothers, J. A. and S. D. Greenwell.

In September, 1921, Hall bought what is referred to as the Greve property for $3500, with the intention of living there. Mrs. Hall objected to moving, preferring to remain and live in the little house at New Florence. Hall insisted on leaving and moving to the Greve place, which finally resulted, as we have already stated, in Mrs. Hall buying from Hall the New Florence two room house in which they were then living. The record discloses that prior to Mrs. Hall being adjudged of unsound mind on September 8, 1922, Hall, for a month or two prior thereto, had not been living with her at New Florence but was living near the Greve property, which he was having repaired at the time.

There is testimony tending to show that after the post-nuptial agreement had been entered into the Halls had a joint bank account which was referred to as a "community fund, out of which they paid

their living expenses, the husband and the wife each contributing one-half of the amount necessary therefor; that all of the expenses of Mrs. Hall at the Fulton Hospital were paid out of her estate by her brothers who had been appointed guardians of her person and estate, and that after Mrs. Halls death her funeral expenses were paid out of her estate, all in conformity with the provisions of the post-nuptial agreement.

Hall, who was a witness in the case, testified that he was 83 years of age and repeatedly said that his memory was very bad, gave as his version of the manner in which he came to sign the post-nupital agreement, that during the year 1921 Mrs. Hall's mental condition was such that the people of New Florence held a meeting to protest against her being permitted to go about the streets by herself; that he did not want her sent to the asylum and said that he was able to manage her; that a day or two before the post-nuptial contract was signed Mrs. Hall's brothers had visited her and had a conference at which Hall was not present; that they arranged that Hall was to take Mrs. Hall to Montgomery City on October 31, which he did. When Hall and his wife arrived at Montgomery City they went to various places in town and as they were passing the office of Mr. Rosenberger, the attorney, on their way to the home of Mrs. Hall's brother, Abe Greenwell, Mrs. Hall's brother, called to Mr. Hall to come into Mr. Rosenberger's office, which Hall did, Mrs. Hall going on to her brother's home; that Mrs. Hall's brother told him they wanted him to sign a little paper "to help keep Annie out of the asylum;" that he replied: "I ain't going to sign nothing there for you fellows. I am afraid of you both. . . . I ain't going to sign nothing here that will get me into trouble." Abe Greenwell answered: "It ain't going to get you into trouble;'" that Mr. Rosenberger thereupon assured him that "it is to help you along. It is not for our interest; it is to help you," and that when he asked: "What are you going to help me about?" Rosenberger replied: "Ain't you trying to keep Annie out of the asylum?" to which Hall answered "yes." Rosenberger then said: "Well, this is to help you. . . . We want to get up a little article here that will make her think that you have signed everything you have got away from her to us. I says, 'Good God, that would be a pretty out, wouldn't it?' I says, 'What are you going to do about it?' I says, 'Do you suppose I am going to sign a thing like that?' He says, 'We won't put a thing down here that you will ever see or hear of again,' and they commenced talking and, oh, such a spiel they put up you never heard. I says I was in a hurry, I had done promised Annie to be on, I was way behind then."

To the question whether he had read the post-nuptial agreement, he answered. "I was in a hurry to go on, and they had promised me

thoroughly, both of them, that that shouldn't contain anything that would get me into trouble, or any division of property or nothing, for I told them if it did I wouldn't sign a thing, says I, 'I ain't in the habit of signing—' "

"Q. (interrupting). Now, did Judge Rosenberger or Abe Greenwell either one read this paper? A. No.

"Q. Neither one of them read it to you? A. No, I didn't know what they had there. I went on out. I didn't stop to think after I had such assurance from both of them, is all, I didn't think it was necessary."

When asked whether he had on that day signed a deed to his wife for the little house in New Florence in which they were living, he answered: "Oh, I reckon I did. I never made a deed unless I did. I don't remember, but I was bound to."

As to the negotiations for his sale of the little house in New Florence to his wife, Hall testified that his wife herself had offered to buy it from him but that he had refused; that she kept after him for almost three weeks.

"Q. Why did she say she wanted that place? A. If I ain't mistaken she would say it is possible you are fixing to put me out of a home. She knew I had bought that there place and was going over to it. I had got tired of that little pig pen. I was going to get out of it and she knew it. She knew me."

Asked what Mrs. Hall had said what she wanted the house for, Hall answered "so as I could not put her out of a home. She said 'you are going to move over yonder and leave me without a home.' I says, 'No, sir, you have got a home over there the day you will go to it, I have got to get out of here, I am done here, you can't live in this little shack.' That is what I said to her and I meant it too."

Though Hall testified that he knew nothing of the contents of the post-nuptial agreement until shortly before the filing of his application for his statutory allowance in the probate court, there is testimony showing that he had obtained a certified copy of the post-nuptial agreement on July 26, 1924, from the recorder of deed's office. A copy of a petition for divorce was introduced in evidence, which showed that Hall, in October, 1923, over a year after Mrs. Hall had been declared insane and committed to the asylum at Fulton, had sued his wife for divorce in the Circuit Court of Montgomery County. That petition for divorce discloses that Hall knew of the post-nuptial agreement for it alleges, among other things, that "on or about the 31st day of October, 1921, the defendant insisted upon a division of plaintiff's property and thereupon, to the great humiliation and shame of plaintiff and to his inconvenience and annoyance, he was forced to and did settle upon the defendant property of the approximate value of $13,600, and that said settlement was forced

upon plaintiff by defendant in order to obtain as much of plaintiff's property as possible, to which she was not lawfully entitled."

It is to be noted that Abe Greenwell, brother of Mrs. Hall, who was present in Mr. Rosenberger's office when the post-nuptial agreement was signed by Hall, died on March 23, 1926; and that Rosenberger died in November, 1929, which accounts for the fact that neither Greenwell nor Rosenberger was a witness in the case though Hall was permitted to testify, though his wife, who was the other party to the post-nuptial contract, was dead.

Appellant assigns as error that no pleading had been filed below on behalf of the estate and that, therefore, the court erred in permitting the post-nuptial contract to be introduced in evidence on the part of the estate. The point is without merit.

In light of sec. 198, Revised Statutes of Missouri 1929 (Mo. Stat. Ann., sec. 198, p. 131), which dispenses with formal pleadings in probate courts, the rule which prevails in justice courts obtains, namely that where there is a failure on the part of the defendant to plead, it is regarded as a tender of the general issue. [Meffert v. Lawson, 315 Mo. 1091, 287 S. W. 610; Rassieur v. Zimmer, 249 Mo. 175, loc. cit. 181, 155 S. W. 24; Monumental Bronze Co. v. Doty, 99 Mo. App. 198, 73 S. W. 234, 78 S. W. 850.] In this situation the defendant estate in the probate court and in the Circuit Court, could interpose any defenses whatever that may exist against any demand, provided, of course, that such defenses were not so inconsistent as to destroy each other. [Sec. 198, *supra*; Greever v. Barker, 204 Mo. App. 190, 223 S. W. 1087; Fenn v. Reber, 153 Mo. App. 219, 132 S. W. 627; Williams v. Gerber, 75 Mo. App. 18.]

We next take up the assignment of error that the trial court erred in admitting the post-nuptial agreement in evidence over plaintiff's objections that it shows on its face that it is void for failure of consideration; that it is against public policy because it is testamentary in character; that no jointure was created thereby; and that said agreement was unilateral.

By reason of secs. 2998 to 3003, Revised Statutes of Missouri 1929 (Mo. Stat. Ann., secs 2998 to 3003, pp. 5055 to 5073), a married woman's legal status in our State is that of a *femme sole* so far as to enable her to transact her own business and to contract and be contracted with in regard to her own personal or real property, and permits a man and his wife to contract with and to sue or be sued by each other. [Rudd v. Rudd (Mo. Sup.), 2 S. W. (2d) 585; Cole v. Cole, 231 Mo. 236, 132 S. W. 734; O'Day v. Meadows, 194 Mo. 588, 92 S. W. 637, 112 Am. St. Rep. 542; Grimes v. Reynolds, 184 Mo. 679, 68 S. W. 588, 83 S. W. 1132; Rice, Stix & Co. v. Sally, 176 Mo. 107, 75 S. W. 398; Clark v. Hackfeld, 16 Hawaii 53.]

Examining the post-nuptial agreement before us, we have in mind

that though prior to the time of its execution the husband and wife had divided their property equally between them, yet each had certain definite statutory rights in the estate of the other in the event of survival. There was a definite consideration flowing from each to the other in that each relinquished and released his statut)ry rights in the estate of the other in the event of survival. Part of the consideration was that Hall, the husband  ". . . . in consideration of his wife releasing unto the husband all of her martial rights aforesaid in her husband's property both before and after death . . . relinquishes and releases any and all marital rights that he may have in his wife's personal estate after her death, including a reasonable allowance for a year's support, the $400 absolute personal property allowed a widower upon the death of his wife, and all other marital rights he may have in his wife's estate." [Egger v. Egger, 225 Mo. 116, loc. cit. 141, 142, 123 S. W. 928; In re Estate Wood, 288 Mo. 588, loc. cit. 600, 232 S. W. 671.]

This post-nuptial contract clearly falls within the rule as laid down by our Supreme Court in the Rudd case, *supra,* namely, that "the limit to which the courts have gone in construcing the Married Women's ·Act is that, while they give a wife power to contract with her husband respecting the acquisition and disposition of property, they do not authorize her to contract with him in regard to the performance of services which the law requires him to perform in the absence of a contract. [Cobb v. Cowdery, 40 Vt. 25, 94 Am. Dec. 370; Robinson v. Jewett, 116 N. Y. 40, 22 N. E. 224; Conover v. Stillwell, 34 N. J. Law, 54.]"

As to the contention that Mrs. Hall was insane on the date that the post-nuptial agreement was entered into, it is sufficient to say that a reading of the record brings us to the conclusion that the trial court properly ruled this question. The overwhelming testimony is to the effect that Mrs. Hall was a capable shrewd business woman and that whenever she had mental delusions she never transacted any business. Again, it is to be remembered that Hall admittedly, upon the same day that the post-nuptial contract was entered into, consummated his sale of the little home at New Florence to his wife, for which she'paid him $600 in cash; and also that on that same day Mrs. Hall made and executed her will, which was duly probated after her death. No witness, not even Hall himself, testified that in their opinion his wife was of unsound mind on the date that she signed the post-nuptial agreement.

As to the charge of fraud testified to by Hall alone, that Emil Rosenberger, the attorney, and Abe Greenberg, Mrs. Hall's brother, had called him into Rosenberger's office and had gotten him to sign his name to what he thought was some writing relating to preventing his wife being placed in an asylum, little credence can be given.

Hall's testimony, which covers pages in the record, shows that he had arrived at an age—eighty-three—when in his individual case he no longer had sufficient mentality to testify accurately regarding any matter or upon any subject. As an example: Pages of his testimony are taken up with an incoherent mass of answers in which he sought to deny that his purported signature to the post-nuptial agreement was in fact his signature, but in the end Hall did admit that the signature to the post-nuptial agreement was his.

Again, though Hall testified that fraud had been practiced upon him by Rosenberger and Abe Greenwell in obtaining his signature to the post-nuptial agreement, and though the record discloses that he did know the contents of the post-nuptial agreement as early as July, 1924, when he obtained a certified copy thereof from the Recorder of Deeds of Montgomery County, Missouri, he did not go to his brother-in-law or to Rosenberger to complain of this alleged fraud, though the brother-in-law lived two years thereafter and Rosenberger five years thereafter. And though Mrs. Hall did not die until 1933, Hall took no steps to have the contract abrogated, but continued, up to the time of her death, to permit, according to the terms of that post-nuptial contract, the expenses of his wife at the asylum at Fulton to be paid for out of her separate estate, and even after her death he allowed the expenses of her last illness and her funeral expenses to be borne by her estate. [See Reynolds v. Rice, 224 Mo. App. 972, loc. cit. 979, 27 S. W. (2d) 1059.]

The trial court properly ruled that there was not sufficient testimony adduced to support the charge that the contract was procured by fraudulent representations practiced upon Hall.

In our view the post-nuptial contract herein is a complete bar to plaintiff's application for his statutory allowance herein sought. There was sufficient and adequate consideration therefor in the mutual covenants to release and relinquish any and all rights whatsoever to any share in the estate of either the husband or wife, thereby giving the husband and wife each the unrestricted power to dispose of his or her estate by will. The contract was eminently reasonable, fair and just. Furthermore we are constrained to the view, in light of this entire record, that the agreement was entered into with a full comprehension and understanding and in good faith and without fraud on the part of Hall and his wife. The judgment is affirmed.
*Hostetter, P. J.*, and *McCullen, J.*, concur.