## Rosciolo Estate.

Argued January 9, 1969. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*Lawrence A. Goldberg,* with him *G. Clinton Fogwell, Jr.,* and *Reilly and Fogwell,* for appellant.

*William R. Keen, Jr.,* with him *Milton Apfelbaum,* for appellees.

OPINION BY MR. CHIEF JUSTICE BELL, April 23 1969:

Umberto Rosciolo and Elda DiSantis were both widowed and had their own families by their respective former marriages. In 1955, they were married, but shortly before, they executed the following Agreement,* prepared by Umberto Rosciolo's lawyer:

"THIS AGREEMENT made and entered into at Coatesville, Chester County, Pennsylvania, by and between UMBERTO ROSCIOLO of Highland Township, Chester County, Pennsylvania, a widower, party of the first part, and

"ELDA DiSANTIS, of the Borough of Downingtown, Chester County and State of Pennsylvania, a widow, party of the second part, WITNESSETH:

"1. The party of the first part and the party of the second part contemplate legal marriage, under the laws of the State of Pennsylvania, and it is agreed that all the properties of any name or nature, real, personal or mixed, wherever they may be found, belonging to

---

* Because of the importance and unusual character of the Agreement, it will be quoted in full.

the party of the first part before marriage, shall be and remain forever, his personal estate, and that this shall include all rents and profits which may in time accrue or result in any manner from increase in value, or be collected for the use of the same in any way.

"2. All properties of any name or nature, real, personal or mixed, wherever the same may be found which belong to the party of the second part before marriage, shall be and remain forever her personal estate, and this shall include all rents and profits which may in time accrue or result in any manner from increase in value, or be collected for the use of the same in any way.

"3. It is agreed between the party of the first part and the party of the second part that each will sign with the other all title papers, deeds or other papers, necessary to transfer property when sold to a purchaser, as such titles are usually executed by a man and wife in this State.

"4. It is further agreed by the party of the first part that he does and will from his own personal estate assume the necessary expense of the support and maintenance of the party of the second part.

"5. It is further agreed that nothing herein shall be construed to be a bar to either party to this agreement, giving any property of which they may be possessed to the other party by Will or otherwise.

"6. It is agreed by both parties hereto that each party has made a full disclosure of his real and personal estate to the other and that there has been no fraud or deception practiced by either one upon the other.

"7. The said Umberto Rosciolo declares that he is the owner in fee simple of certain real estate situate in the Townships of West Marlborough, West Fallowfield and Highland, Chester County, Pennsylvania.

"8. The said Elda DiSantis declares that she is the owner in fee simple of certain real estate situate in the Borough of Downingtown, and in the City of Coatesville, Chester County, Pennsylvania, as well as a restaurant business in the said City of Coatesville.

"In Witness Whereof, the parties hereto have hereunto set their hands and seals this Eighteenth day of January, A.D. 1955.

(s)  Umberto Rosciolo    (seal)

(s)  Elda  DiSantis     (seal)

"Witnesses:

  (s)  Norman J. Pine

  (s)  Hanna Stringer"

Umberto died *February 23, 1966,* and by will dated October 2, 1964, devised and bequeathed his entire estate in equal shares to each of his five children by his former marriage. The will named his two daughters, Helen Reynolds and Anna Toth, executrices, and Letters Testamentary were granted to them on March 10, 1966. On May 9, 1966, Elda filed a widow's election to take against the will. The executrices responded by filing a petition which alleged the existence of the Agreement of January 18, 1955, set forth above, and requested a citation to show cause why the election should not be vacated.

Elda filed an answer to the petition. Appellant Elda does not contend that there was any failure of a full and fair disclosure of the property of each, or that there was any fraud or deception practiced by either party. Her sole contention was set forth in Paragraph 8 of her answer, which reads as follows: "It is admitted that Elda DiSantis now Elda Rosciolo entered into a pre-nuptial agreement with the decedent, Umberto Rosciolo dated January 18, 1955. However, the decedent Umberto Rosciolo did by various acts of desertion and nonsupport breach the agreement of January 18, 1955 making said instrument null and

void and without effect to prevent Elda Rosciolo from taking against the Will of Umberto Rosciolo. In the alternative it is alleged that under paragraph four of the agreement of January 18, 1955 Elda Rosciolo is entitled to support from the Estate of Umberto Rosciolo for the rest of her natural life."

After a Court hearing at which no testimony was taken, the Court, upon motion of appellant, orally dismissed the petition. Judge MacELREE thereafter reopened the case to afford the executrices an opportunity to present oral testimony in support of their petition to vacate the widow's election.

The general and pertinent principles governing antenuptial agreements have been so recently set forth at great length in *Hillegass Estate*, 431 Pa. 144, 244 A. 2d 672, and in *Harris Estate*, 431 Pa. 293, 245 A. 2d 647, that we find it unnecessary to repeat them. It will suffice to say that an antenuptial agreement is presumptively valid and binding and can be overcome, avoided or nullified in the ways set forth in said cases. However, the present case is unusual, in that appellant-widow does not challenge the validity of the Antenuptial Agreement but only (a) its meaning, and (b) whether she waived her right or election to take against the will as to which there was *no express provision*, and (c) whether a subsequent breach of the Agreement by the decedent nullified the Antenuptial Agreement. At the first hearing before the Orphans' Court Judge, the widow (1) abandoned the contention set forth in her answer, namely, that the Agreement was nullified because of the decedent's desertion and nonsupport, and (2) based her claim and her right to an election to take against his will on the fact that the Antenuptial Agreement did not contain an express waiver of this right.

At the final Court hearing on December 15, 1967, the executrices presented the testimony of several wit-

nesses. Included among the witnesses called by the executrices was the widow, who was called as on cross-examination. The purpose of this testimony was to show the widow's understanding of the meaning and the scope of the Antenuptial Agreement. Counsel for the widow vigorously objected to the introduction of this testimony on the ground that it violated the parol evidence rule. Judge MacElree admitted the evidence, which is not only relevant and very important, but in our judgment is admissible.

Appellant had completed only the first grade of school in Italy and did not seem to understand the English language very well. In response to a question by appellees' counsel as to what appellant told a friend of hers, Mr. Skiba, about the Agreement, she replied, "A. My property, mine; his property was his, but have to take care of me on his property. Q. What did you say, exactly? A. That is all, just that. Q. Did you say anything about what took place if you died or he died? A. As I say, if he die, his property belongs to his children, but before he got to take care of me. That was on agreement. I remember, said to my husband, you ought to take care of your wife. He get up off chair, and say, yes, and he said, he take care of me."

Considering the written Antenuptial Agreement, we believe that the parties intended and agreed, as clearly and specifically stated therein, "that all the properties [of each] of any name or nature, real, personal or mixed, wherever they may be found . . . shall be and remain forever" his and her respective personal estate. The Agreement provided, as above fully set forth, that each party had made a full disclosure to the other of his and her respective real and personal estate, and this was followed by a statement of the real estate which he owned and of the real estate and restaurant business which she owned. In our judgment, this An-

tenuptial Agreement precludes any right of either party to take against the will of the other,* even though there is no express waiver.

However, if the Agreement is considered ambiguous, then it would be open to relevant parol evidence if legally admissible, and the evidence of the surviving party as to the meaning and scope of the Agreement, if and when called by the decedent's personal representatives as on cross-examination, would be admissible. Compare: *Slavinski Estate,* 420 Pa. 504, 218 A. 2d 125, and *Yuhas v. Schmidt,* 434 Pa. 447, 258 A. 2d 616. Considering the oral testimony of the widow on cross-examination, any doubt that might exist as to the meaning of the Antenuptial Agreement is removed, and it is clear that the widow had waived all her rights in and to her prospective husband's estate, including her right to take against his will.**

Decree affirmed; costs to be borne by the Estate.

---

* The Agreement further provided in Paragraph 5 that each party could give to the other, by will or otherwise, any property which either possessed.

** We agree with the observation of Judge MACELREE that the rejection of the widow's claim to take against her husband's will does not bar her from claiming at the audit all proper expenses of maintenance and support which, in Paragraph 4 of the Agreement, the decedent had covenanted to provide.