Ratony Estate.

Argued January 20, 1971. Before BELL, C. J., JONES, EAGEN, O'BRIEN, ROBERTS, POMEROY and BARBIERI, JJ.

*Franklin L. Gordon,* with him *Gordon and Ashton,* for appellant.

*William R. Keen, Jr.,* with him *Milton Apfelbaum,* for appellee.

OPINION BY MR. CHIEF JUSTICE BELL, June 1, 1971:

This appeal involves the validity of a postnuptial Separation Agreement.

Decedent, Alexander Ratony, Jr., and appellant, Julia Ratony, were married on June 15, 1940. On June 20, the Ratonys purchased property in Coatesville, Pennsylvania, *as tenants by the entireties.* Sixteen months later, being then separated, they conveyed the property for a net sum of $620. On December 11, 1941, they executed a formal Separation Agreement. The Agreement was drawn by the decedent's attorney, who also witnessed its signing. After the Agreement was entered into, the parties continued to live apart and appellant made no attempt to attack or set aside or ignore the clear language of this Agreement or the mutual promises they made therein, until after decedent's death on August 26, 1968, twenty-seven years later.

In the Separation Agreement, *which contained mutual promises and mutual releases,* they (1) divided all the net proceeds of the sale of their home which they owned as tenants by the entireties, namely $620; and (2) agreed to divide all the furniture and personal articles which they owned, as well as certain leased articles; and, most important of all, (3) mutually agreed that ". . . this shall be a full and complete settlement of all property rights between the parties [and] from this time forward, neither party shall have any property interests in any property owned by the other." The parties in this case were (when they made this Agreement) extremely poor. The husband gave his wife one-half of everything he had in the world. In the twenty-seven years in which they lived separate and apart, appellant never made any attempt to go back and live with the husband, or to get any support from him, or to claim any of his subsequently acquired property, or made any attempt to set aside or attack the Separation Agreement.

The Separation Agreement provides as follows:

"Separation Agreement

"This agreement made this 11th day of December, 1941, by and between Alexander Ratony, Jr., and Julia, his wife, witnesseth:

"Whereas differences have arisen between the parties on account of which they are now separated and are now living separate and apart and *intending to live separate and apart from each other during the remainder of their natural lives,*\* and

"Whereas the home formerly occupied by the parties has been sold and the various debts in connection with the said real estate have been paid, and

"Whereas there has resulted a fund of six hundred and twenty dollars ($620.00), and

---

\* Italics throughout ours, unless otherwise noted.

"Whereas the parties have mutually agreed upon a division of the furniture, and upon the retention of all personal articles belonging to each other and have agreed to either return or take over certain leased articles.

"Now, therefore *in settlement, adjustment and compromise of all property, questions and rights, the parties hereto have mutually agreed* that upon the division of the said six hundred and twenty dollars ($620.00) and upon the payment of three hundred and ten dollars ($310.00) thereof to Julia, the wife, that *this shall be a full and complete settlement of all property rights between the parties. From this time forward, neither party shall have any property interests in any property owned by the other.* [Could any language be clearer?]

"The said Julia hereby expressly agrees that the said division and the said payment shall be in lieu of all claims for support and she hereby expressly agrees that she will not assert any further claim for support against her said husband.

"This agreement does not prevent or in any way militate against the right of either party to ask for and obtain a divorce, nor does it admit or deny any such right.

"In witness whereof the parties do hereto set their hands and seals this 11th day of December 1941.

> (s)  Julia Ratony
> (s)  Alexander Ratony, Jr.

"(s) Walter A. Herley, Witness to both

"Received $310.00 in full. Dec. 14, 1941.

> (s)  Julia Ratony"

Appellant filed an election to take against decedent's will and, pursuant to Section 11 of the Estates Act of 1947, P. L. 100, an election to take against certain of his inter vivos conveyances. Since the estate is insolvent, the only relevant election is her claim under Section 11. She therefore filed objections to the

first and final account of decedent's executrix, based on her failure to include certain assets which were transferred by decedent during his lifetime. The lower Court found the Separation Agreement to be valid *and that, as of the date thereof, "the decedent and his wife possessed no assets other than the proceeds from the sale of their former home together with certain items of furniture* and personal items referred to in the agreement of that date." This very important finding of fact, *which the minority completely ignore,* was certainly and unquestionably supported by the evidence and, together with the above-quoted Agreement and the mutual promises and releases therein contained, is decisive of this case! Accordingly, the Court confirmed the account and dismissed appellant's objections. This appeal followed.

It is appellant's contention that the Separation Agreement, notwithstanding its crystal-clear language *and its mutual promises and mutual releases of any property interests in any property then and "from this time forward"* owned by the other, discloses a want or failure of consideration, and, consequently, does not bar her right to take against his will or his (so-called) inter vivos conveyances.

We find absolutely no merit in any of appellant's contentions.

Preliminarily, we are of the opinion that the principles applicable to antenuptial agreements, even though the consideration and the circumstances may sometimes differ slightly, are equally applicable to postnuptial agreements. See *Slagle's Appeal,* 294 Pa. 442, 144 Atl. 426.

It is a general principle of law which has existed for centuries that mutual promises are binding upon the parties thereto and furnish valid consideration. Section 103, Williston on Contracts (3d Ed. 1957); §75, Restatement of the Law, Contracts; 8 P.L.E., Contracts,

§45; *Jessup & Moore Paper Co. v. Bryant Paper Co.,* 283 Pa. 434, 129 Atl. 559; *Gredler Estate,* 361 Pa. 384, 65 A. 2d 404; *Rosciolo Estate,* 434 Pa. 461, 258 A. 2d 623; *Kaplan v. Kaplan,* 25 Ill. 2d 181. 8 P.L.E., Contracts, §45, states: "Mutual promises afford sufficient legal consideration for the support of each other, and the mutual promises of the parties are sufficient to create a binding contract." In *Jessup & Moore Paper Co. v. Bryant Paper Co.,* 283 Pa., supra, this Court said (page 441): " 'Where there is no other consideration for a contract, mutual promises must be binding on both parties.' " In *Gredler Estate,* 361 Pa., supra, we pertinently said (page 387): "These mutual promises, made by the parties in the presence of a witness, (cf. Moffitt v. Moffitt, 340 Pa. 107, 16 A. 2d 418) constituted an enforceable contract."

In *Rosciolo Estate,* 434 Pa., supra, the parties entered into a mutually-executed antenuptial agreement. This agreement was drawn by an attorney for the husband and, as in the present case, the wife did not have an attorney. The agreement pertinently provided: "[I]t is agreed that all the properties of any name or nature, real, personal or mixed, wherever they may be found, belonging to the party of the first part before marriage, shall be and remain forever, his personal estate. . . ." There then followed a disclosure by the parties of their respective properties, but there was no provision with respect to an abandonment of the right of a wife to take against her husband's will.*

Upon her husband's death, the wife elected to take against her husband's will. She presented several contentions which she finally limited to one, namely, she "based her claim and her right to an election to take against his will on the fact that the Antenuptial Agree-

---

* And similarly no provision for abandonment by a husband of his right to take against his wife's will.

ment [which contained less specific language and less clear property releases than does the Agreement in the present case] *did not contain an express waiver of this right [to take against his will].*" In spite of the fact that Mrs. Rosciolo (an Italian) spoke and understood very little of the English language, a unanimous Supreme Court stated (pages 466-467) : "In our judgment, this Antenuptial Agreement precludes any right of either party to take against the will of the other, *even though there is no express waiver.*"

We believe the following portion of the present Agreement, "in settlement and . . . compromise *of all property,* questions *and rights,* the parties hereto have *mutually agreed that . . . this shall be a full and complete settlement of all property rights between the parties. From this time forward, neither party shall have any property interests in any property owned by the other,*" clearly and unequivocally provides that the wife gave up all rights to and all property rights and all property interests in any property of decedent then or from that time forward owned by the husband.

Because of the different and very intimate relationship of husband and wife (and of prospective spouses), *one of two* additional factors has been required to validate ante- and postnuptial agreements. An antenuptial or postnuptial agreement is presumed to be valid and binding upon the parties thereto and the party seeking to avoid or nullify or circumvent the agreement has, without any doubt, the burden of proving the invalidity of the agreement by clear and convincing evidence. That burden can be met by proving *either one* of the two following factors—(1) a reasonable provision for the claiming spouse was not made *at the time of the agreement* or (2) in the absence of such a provision, a full and fair disclosure of the other's worth was not made. Moreover, the reasonableness must be determined as of the date of the agreement and not in the light of hind-

sight—such a "hindsight" test would make a mockery of the rule and the realities of life. *Hillegass Estate,* 431 Pa. 144, 244 A. 2d 672; *Gelb Estate,* 425 Pa. 117, 228 A. 2d 367. In *Hillegass Estate,* we said (page 150):

"(1)  An Antenuptial Agreement is presumptively valid and binding upon the parties thereto.

"(2)  *The person seeking to nullify** or avoid or circumvent the Agreement has the burden of proving the invalidity of the Agreement by clear and convincing evidence that the deceased spouse at the time of the Agreement made *neither* (a) *a reasonable provision for the intended spouse, nor* (b) *a full and fair disclosure* of his (or her) worth. Gelb Estate, 425 Pa., supra, page 123; Kaufmann Estate, 404 Pa., supra, page 136 [per Justice Jones]; McClellan Estate, 365 Pa., supra, page 407; Emery Estate, 362 Pa., supra, pages 142, 146; Snyder Estate, 375 Pa. 185, 188, 100 A. 2d 67.

"(3)  In evaluating the reasonableness of the provision for the survivor, such reasonableness must be determined *as of the time of the Agreement* and not by hindsight. Gelb Estate, 425 Pa., supra, page 123; Kaufmann Estate, 404 Pa., supra, page 137 [per Justice Jones]. *Reasonableness* will depend upon the totality of all the facts and circumstances *at the time of the Agreement,* including (a) the financial worth of the intended husband; (b) the financial status of the intended wife; . . ."

Even if we ignore and nullify the clear and unambiguous language of this Agreement with all its mutual promises, we cannot escape the conclusion that a gift (or proper division) by the husband to his separated (and for 27 years thoroughly satisfied) wife of one-half of everything he had in all the world was not only a reasonable provision but undoubtedly a fair one.

---

* Italics in this quote are in *Hillegass Estate.*

Appellant, at least impliedly, recognized this when she attempted to prove that her husband had additional and undisclosed assets. Appellant was *the only witness* to offer any evidence of the additional property which she now contends was owned by decedent at the time the Separation Agreement was executed.\* *When asked whether she or decedent owned any property aside from that mentioned in the Agreement, she answered in the negative.* At a later hearing she recanted to the extent that she then testified that she thought the word "property" referred only to real estate and she thought that, at the time of the Agreement decedent had a bank account and stocks and bonds. Specifically, she stated that the decedent's bank accounts were in The National Bank of Chester Valley and that the bonds were U. S. War Bonds paid for by payroll deduction at his place of employment. However, *by stipulation of the parties,* it was later revealed that *prior to and at the time of the Separation Agreement* he had no account in The National Bank of Chester Valley and no payroll deduction was in force at the decedent's job. With regard to the stocks allegedly owned by decedent, appellant was unable to recall the names of the stocks or the companies or the name of his broker. In short, the only evidence that decedent had any additional assets at the time of the Agreement was appellant's conflicting statements and *unproved* beliefs. The lower Court was fully justified in finding as a matter of fact that ". . . *as of December 11, 1941, the decedent and his wife possessed no assets other than the proceeds from the sale of their former home together with certain items of furniture*

---

\* Counsel for the estate objected to appellant's testimony on the basis of the Dead Man's Rule, Act of 1887, P. L. 158, 28 P.S. §322. The objection was initially overruled, but sustained at a later hearing. However, counsel for the estate thereupon (unwisely) withdrew his objection.

*and personal items referred to in the agreement of that date."*

Mr. Justice ROBERTS in his dissenting Opinion states that this is only a "consensual *support* settlement." This contention completely *ignores, obliterates and nullifies* all the express and mutual agreements and settlements "of all property questions and rights . . . from this time forward neither party shall have any property interests in any property owned by the other." This is far, far more than an agreement of separation and support. Furthermore, Justice ROBERTS contends that the *waiver of the wife's right or claim for support* against her husband "evinces a clear intent on the part of the parties to the agreement that *the $620 to be divided between them was to serve in lieu of further support payments."* This is obviously completely devoid of merit—it gives the wife *for her support* only the tiny amount of $310, which would have resulted in the ridiculous amount of $13.28 a year, based on the length of time she lived after the Separation Agreement was executed. Justice ROBERTS further contends there was a want of consideration for the Agreement. He not only overlooks the aforesaid mutual promises and mutual property agreements and settlements, he also overlooks the facts that (1) both parties were extremely poor; and (2) the wife acquired, in addition to the aforesaid sum of money and a division of their furnishings and other personal property, a right to a separate existence for her life (a) without any interference from her husband, and (b) without any marital duties, such as the duty to cook or keep house; and (3) she secured her absolute liberty; and (4) she secured the important right to receive and keep, without any claim thereto from her husband or any rights of her husband therein, any money she might (a) inherit, and (b) make from her work, or (c) win.

Mr. Justice JONES would reverse the Court below because he believes the wife received no consideration,

or no reasonable provision. Justice JONES then advocates a *new* test for the determination of consideration in a postnuptial agreement. He first overlooks the fact that the parties mutually agreed that from this time forward each would have no rights or interest in any property of the other. These mutual promises furnish legal consideration for this agreement (see our many cases, supra) and no sound or justifiable reasons exist to induce us to invalidate or change our prior decisions and render these mutual promises meaningless. In addition to our prior decisions, we are further supported by the recent case of *Kaplan v. Kaplan,* 25 Ill. 2d 181, 182 N.E. 2d 706 (1962). In *Kaplan,* that Court, in discussing whether such mutual releases were a valid consideration for a property settlement *between a husband and wife,* pertinently said (page 708) : ". . . without considering other elements of consideration flowing to the plaintiff which could be mentioned *such mutual covenants were in themselves sufficient to support the agreement.* Kroell v. Kroell, 219 Ill. 105, 112, 76 N.E. 63; Seuss v. Schukat, 358 Ill. 27, 34, 192 N.E. 668, 95 A.L.R. 1461." See also, *Rockwell v. Est. of Rockwell,* 24 Mich. App. 593, 180 N.W. 2d 498; 24 Am. Jur. 2d, Divorce and Separation, §887. No matter how named, Justice JONES seems to hold that whether mutual promises and mutual releases are a valid consideration *depends upon whether the surviving spouse or the deceased spouse* "is the one who relinquished his or her intestate share in exchange for certain property." Whether or not this is called a "hindsight" test—as we believe it is—its nomenclature is immaterial. What is important is the inescapable fact that such a waiting period or test *flies directly in the teeth* of the test which our prior cases have established and which, we repeat, Justice JONES himself has aided in establishing. In *Kaufmann Estate,* 404 Pa. 131, 137, 171 A. 2d 48, 51 (1961), the Court said: "(3) in evaluating the *reason-*

*ableness* of the provision for the wife, such reasonableness must be determined as of the date of the agreement and not by hindsight."

Moreover, what is the use of having antenuptial or postnuptial written agreements which contain mutual promises, mutual agreements and mutual releases of all property and property interests and property rights, if such agreements, promises and releases are treated by the Courts as worthless, meaningless nullities, and the rights of the husband and wife must (in the absence of a full and fair disclosure) be determined by and dependent upon which spouse survives?

*Levine Estate*, 383 Pa. 354, 118 A. 2d 741, is clearly distinguishable. There, although the parties exchanged mutual waivers of any interest in the estate of the other, this agreement was held to lack consideration *because the husband by a prior written instrument had already waived all claims he might have had in his wife's estate.*

For these reasons, we find no merit in any of the contentions made by appellant or in any of the erroneous and novel interpretations enunciated in the dissenting Opinions, which realistically make a nullity of our prior decisions and of the clear and express mutual promises and agreements which the parties themselves made and kept for twenty-seven years.

Decree affirmed; appellant to pay costs.

Mr. Justice EAGEN and Mr. Justice POMEROY concur in the result.

———

CONCURRING OPINION BY MR. JUSTICE BARBIERI:

I concur in the conclusion reached in the Opinion of the Court and disagree with the dissenters for two reasons. First, I believe that the separation agreement in this case encompassed all property rights between the two spouses and not just the matter of support.

Secondly, I believe that there was legally sufficient consideration as to the widow. Under the agreement, she received one-half of the net proceeds of the sale of their house, which they had owned as tenants by the entireties. Thus, she did not receive that to which she was already legally entitled, as did the widow in *Levine Estate*, 383 Pa. 354, 118 A. 2d 741 (1955), where, prior to the separation agreement, the property was owned as a tenancy in common. My research has uncovered no case indicating that a tenant by the entireties has the right or the power, except in very limited circumstances, to partition prior to divorce.* The separation agreement in this case thus gave the widow the present right to an interest she could not have otherwise obtained except by being divorced from or predeceased by her husband.

---

DISSENTING OPINION BY MR. JUSTICE JONES:

I reluctantly must dissent from the view expressed by the majority opinion.

It appears to me that the majority, by reiterating the "reasonable provision or full and fair disclosure" test, has lost sight of *the necessity for consideration* for this so-called postnuptial agreement. In cases turn-

---

* There is no argument that the proceeds of the sale of the house were not also owned by the entireties. See, e.g., 41 C.J.S. Husband and Wife §§481, 485. Our Court has not allowed partition of an entireties estate except when "one spouse has been appropriating the property to his or her own use so that there has been a wrongful exclusion," *Linett v. Linett*, 437 Pa. 138, 142, 262 A. 2d 849 (1970) ; see also *Lindenfelser v. Lindenfelser*, 396 Pa. 530, 153 A. 2d 901 (1959) ; when one of the spouses is incompetent, *Interboro Bank & Trust Co. Appeal*, 359 Pa. 315, 59 A. 2d 101 (1948) ; or when the court finds an explicit or implied agreement between the spouses to partition, *Berhalter v. Berhalter*, 315 Pa. 225, 173 Atl. 172 (1934). There is no indication that any of these conditions was present *prior* to the postnuptial agreement in this case.

ing on the "reasonable provision" standard, there is generally no occasion to question whether there is *any* consideration; the usual inquiry is whether a sufficient amount has been given. On the other hand, an implied corollary to the "full and fair disclosure" test is the requirement that there be consideration to support the agreement. Although I would affirm the court below only if the latter alternative—the "full and fair disclosure" test—is met, I find it necessary to first question the reasonableness of Alexander Ratony's provision for his wife.

While realizing that many prior decisions of this Court indicated that the crucial examination date for the "reasonable provision" test is the date of execution, I, initially, articulated the statement that, "such reasonableness must be determined as of the date of the agreement and not by hindsight". *Kaufmann Estate,* 404 Pa. 131, 137, 171 A. 2d 48, 51 (1961). I have never intimated any displeasure with this principle and, contrary to the majority's assertion, I do not now advocate the adoption of any hindsight test.

Perhaps the crux of my dispute with the majority's "reasonable provision" examination merely represents a different perspective. Nonetheless, it is no coincidence that the majority states at two places in its opinion, in slightly different words, "the husband gave his wife one-half of everything *he* had in the world." (Emphasis added.) To my way of thinking, a more correct statement of this thought would substitute the pronoun "they": "the husband gave his wife one-half of everything *they* had in the world." Indeed, as I shall demonstrate shortly, I would state that, "the husband gave his wife everything *she* had in the world."

Reviewing the agreement, Julia Ratony received: (1) one-half the proceeds of the sale of the former residence—a fund she was entitled to as a matter of law; (2) her personal effects—property which she

owned and controlled at all times; and (3) certain pieces of furniture—one-half of which belonged to her anyway, *cf.*, *Lindenfelser v. Lindenfelser*, 396 Pa. 530, 153 A. 2d 901 (1959), and *DeLuca v. DeLuca*, 388 Pa. 167, 130 A. 2d 179 (1957).* Since all of this tangible property was legally owned by Julia Ratony, she received nothing for the release of her intestate share which was not hers originally. Accordingly, I would hold that when a wife receives nothing besides that which she already had and not only releases her husband from his support obligations but also foregoes her right to share in his estate, such agreement is manifestly unreasonable.

Returning to the "full and fair disclosure" test, it is my position that even if there had been a full and fair disclosure (a dubious assumption in my opinion), there is no consideration to support this agreement. Besides the precedents in this Commonwealth cited by Justice ROBERTS in his dissenting opinion, the overwhelming weight of authority recognizes that a postnuptial or separation agreement, like any other contract, must be supported by valid consideration. 41 Am. Jur. *Husband and Wife*, §262 (1968) ; 26A C.J.S. *Descent and Distribution*, §58b (1956). Although the majority notes that the legal principles governing antenuptial and postnuptial agreements may sometimes differ due to the consideration supporting the agreement, the general equation of these two types of contracts overlooks the rule that, "[t]he marriage, since it is

---

* Since Alexander Ratony was alive when the furniture was divided, there is no occasion to invoke the common law presumption that the husband owned the furniture contained in the marital home at the time of his death: *King Estate*, 387 Pa. 119, 126 A. 2d 463 (1956) ; *Matheny Estate*, 164 Pa. Superior Ct. 18, 63 A. 2d 477 (1949). Despite this Court's approval in *King Estate*, I question the continuing validity of this presumption. *See*, *Fine v. Fine*, 367 Pa. 227, 77 A. 2d 436 (1951).

already existing does not furnish consideration for a postnuptial agreement or settlement as it does for an antenuptial agreement." 41 Am. Jur. 2d *Husband and Wife,* §263 (1968). Accordingly, it becomes necessary to search for Alexander Ratony's elusive consideration.

Insofar as I have already demonstrated that Julia received no tangible benefits, the only arguable consideration supplied by Alexander Ratony was his corresponding release of his intestate share in Julia's estate; so framed, the sole question is whether the mutual release by each spouse of his or her interest in the estate of the other constitutes the valid consideration necessary to support a postnuptial separation agreement. My research discloses a conflict of authority on this point. *Compare, Unger v. Mellinger,* 37 Ind. App. 639, 77 N.E. 814 (1906), *with Edwards v. Edwards,* 267 Ill. 111, 107 N.E. 847 (1915). *See, also, Smith's Adm'r v. Price,* 252 Ky. 806, 68 S.W. 2d 422 (1934); *Hall v. Greenwell,* 231 Mo. App. 1093, 85 S.W. 2d 150 (1935). Employing the familiar principle that a spouse's release of his or her intestate share supplies the consideration for a transaction with the other spouse, the Illinois Supreme Court in *Edwards* held that the widow who released her dower interest in exchange for her spouse's relinquishment of his interest in her property was barred from sharing in his estate. Relying on the principle that the intestate share is not a present interest when the contract is entered, the Appellate Court of Indiana came to a contrary conclusion in *Unger* as it held a widower received no consideration from his wife for his release and hence could claim his intestate share. Analyzing these two rationales, I am persuaded by the Indiana Court. In the situation where the *surviving* spouse is the one who relinquished his or her intestate share in exchange for certain property, I would rely on the rule that such release is a valid consideration. However, where the

*deceased* spouse is the one who relinquished his or her intestate share in exchange for certain property, the deceased spouse has never furnished anything since that spouse's intestate share in the estate of his or her mate was divested by the prior death of the decedent. Accordingly, in the mutual release situation, the deceased spouse, whoever it may be, has never surrendered anything.

For these reasons I dissent.

_____

DISSENTING OPINION BY MR. JUSTICE ROBERTS:

I am compelled to dissent for three reasons. In the first place, I am unable to accept the majority's view that Julia and Alexander Ratony *mutually* intended the document signed on December 11, 1941, to be a waiver and a release of Mrs. Ratony's statutory interest in her husband's estate. Secondly, I think the agreement should be held void and unenforceable for reasons of public policy. Finally, the agreement is invalid for want of consideration.

The majority opinion ignores some of the most fundamental principles underlying our domestic relations law. Primarily, it ignores the distinction between marriage settlements (postnuptial and antenuptial agreements) concerning the disposition of the spouses' respective interests in the estate of the other, and separation agreements concerning the rights of spouses to live apart and the right of a wife to support, maintenance, and the property presently owned jointly between them as tenants by the entireties. This distinction is crucial in many circumstances. For example, a separation agreement may be abrogated by a reconciliation, whereas a postnuptial property settlement will not be annulled merely by reconciliation, and it is the intention of the parties and the surrounding facts which determine what type of agreement has been created in each case. See *Zlotziver v. Zlotziver,* 355 Pa. 299, 49 A. 2d

779 (1946); *Commonwealth ex rel. DiValerio v. DiValerio,* 169 Pa. Superior Ct. 477, 82 A. 2d 687 (1951); *Commonwealth ex rel. Makowski v. Makowski,* 163 Pa. Superior Ct. 441, 62 A. 2d 71 (1948); see generally, 18 P.L.E., Husband and Wife, §§24, 101, 103; Note, 40 Dick. L. Rev. 41 (1935).

I believe that the Ratony document was a separation agreement rather than a marriage settlement. In any case, no matter what it was, I do not think Mrs. Ratony intended to waive her statutory interest in Alexander Ratony's estate. We have a tradition of closely scrutinizing nuptial agreements and the surrounding circumstances. E.g., *Mary Ann Slagle's Appeal,* 294 Pa. 442, 144 Atl. 426 (1928). The Ratony agreement nowhere makes reference to after acquired property, nor does it by its express terms refer to a wife's right of election to take against her husband's will or her intestate rights. The agreement merely states that sum of three hundred and ten dollars is ". . . a full and complete settlement of all property rights between the parties" and that from then on ". . . neither party shall have any property interests in any property owned by the other." Contrary to the majority's rhetorical question, this language is far from clear. Compare the language of the agreement at issue in *Hillegass Estate,* 431 Pa. 144, 244 A. 2d 672 (1968).[1]

There is no evidence in the record that Mrs. Ratony even knew of the existence of her intestate rights or her right to take against her husband's will. It is well established that where a husband and wife separate be-

---

[1] In *Hillegass Estate,* the relevant portion of the agreement read as follows: "'Whereas it is the intention of the intended wife to waive, relinquish and bar all her inchoate intestate and other rights or interests, either as wife or widow of the First Party, in and to any property now owned or hereafter acquired by the First Party, including her right of election to take against the Will of the First Party.'" Id. at 147, 244 A. 2d at 674 (emphasis omitted).

cause they cannot live happily together, the wife is entitled to her statutory interest in his estate on his death absent a clear expression of waiver of those rights. *Lawton's Estate,* 266 Pa. 558, 109 Atl. 699 (1920). This principle holds true as long as the surviving spouse has not forfeited her right to the estate, as for example, she would if she willfully and maliciously deserted her husband for one year prior to his death. Intestate Act of 1947, P. L. 80, §6, 20 P.S. §1.6. See *Watt Estate,* 409 Pa. 44, 185 A. 2d 781 (1962); *Hudak Estate,* 383 Pa. 278, 118 A. 2d 577 (1955). No such forfeiture occurred in the present case.

Confronted with at best an ambiguous agreement, we should be guided by the traditional rules of construction in this area. Courts do not generally attempt to read a broad waiver of intestacy rights into unclear documents. In *Estate of Dick,* 102 Pa. Superior Ct. 589, 157 Atl. 349 (1931) it was stated: "Without the agreement, the law governed the relations of husband and wife, and within well understood limits, the possible disposition or devolution of the property of either. By their agreement, they prescribed for themselves certain changes in the law governing their marital status different from what the law prescribed. But there is no agreement that, on the death of either, the devolution of property prescribed by the intestate law shall not take place. *So radical a change in the legal rights of the parties must be stated expressly, or at least appear by inevitable implication*: Talbot v. Calvert, 24 Pa. 327; Rice v. Rice, 2 W.N.C. 672; Scott's Estate (2), 147 Pa. 102, 23 A. 214; Kaiser's Estate, 199 Pa. 269, 49 A. 79, 85 Am. St. Rep. 785; Mark's Estate, 297 Pa. 290, 147 A. 54." Id. at 592, 157 Atl. at 351. (Emphasis added.)

I cannot accept the conclusion that Julia Ratony here did what the *Dick* opinion requires to surrender her interest in her husband's estate. There also is evi-

dence that she was completely unfamiliar with financial or legal agreements and that she was not advised by counsel. The intelligence of the wife should be considered in evaluating the reasonableness of the provision for her in a postnuptial agreement. See *Kaufmann Estate,* 404 Pa. 131, 137, 171 A. 2d 48, 51 (1961) ; *Warner's Estate,* 207 Pa. 580, 57 Atl. 35 (1904).

Aside from the question of mutual intention, this agreement should be unforceable for reasons of public policy. While a couple remains married, a husband owes a duty of support to his wife, even where the separation is consensual. *Commonwealth ex rel. Davidoff v. Davidoff,* 178 Pa. Superior Ct. 549, 115 A. 2d 892 (1955) ; *Scott v. Scott,* 95 Pa. Superior Ct. 273 (1929). If the Ratonys had come into court at the time they signed the agreement, not only their present property but also Mr. Ratony's *future earning power* would have been considered in fixing a support order for Mrs. Ratony. See *Lindenfelser v. Lindenfelser,* 396 Pa. 530, 153 A. 2d 901 (1959) ; *Commonwealth ex rel. Simmler v. Simmler,* 134 Pa. Superior Ct. 339, 4 A. 2d 215 (1939).

One of the most fundamental rules in this area of our domestic relations law is that deeds and postnuptial agreements for the actual and immediate separation of husband and wife are valid *when based on a good consideration and are reasonable in their terms.* See *In re Singer's Estate,* 233 Pa. 55, 81 Atl. 898 (1911). The majority makes much of the fact that the chancellor found that $620 was all the Ratonys possessed at the time of the agreement. To view such a finding as dispositive of the reasonableness and validity of this agreement is to resist an examination of the attendant circumstances. No matter how minimal the joint property of the Ratonys owned at the time of separation, Mr. Ratony had future earning power. I cannot accept the proposition that $310 was a reasonable provision for Mrs. Ratony's maintenance and sup-

port during the remainder of their marriage, taking into consideration her husband's property, income and earning capacity, and the family's condition or station in life. See *Commonwealth ex rel. Zehring v. Zehring,* 186 Pa. Superior Ct. 393, 142 A. 2d 397 (1958).

While this Commonwealth has not to date joined with those jurisdictions which will not enforce lump sum settlement and waivers of future support,[2] we should at the least carefully scrutinize such waivers, especially where the agreement is unclear. Sound public policy in my view favors an uncompromising determination to preserve important incidents of the marriage relationship during its continuance whatever the contrary sentiments of the parties themselves may be, unless there is a clear and explicit waiver by the wife of her maintenance and support rights, and a showing of an ability to support herself.

Finally, the agreement is unenforceable for want of consideration. Almost a century ago it was established that a court of equity would not enforce a postnuptial agreement if the wife has received no benefit under it, and a wife's rights under the intestate laws would be preserved for her. *Campbell and Others' Appeal,* 80 Pa. 298, 309 (1876) (report of the master, Chief Justice THOMPSON, adopted by the Court).

This principle was applied in a more modern context in *Levine Estate,* 383 Pa. 354, 118 A. 2d 741 (1955). There, husband and wife executed a postnuptial agreement that one-half of a certain checking account would belong to the wife in exchange for her release of all rights in his estate. After the husband died, she elected to take against the will on the theory that here had been

---

[2] See, e.g., *Estate of Duncan,* 87 Colo. 149, 285 P. 757 (1930); *Trecker's Estate,* 107 Ill. App. 2d 94, 246 N.E. 2d 56 (1969); *Kovler v. Vagenheim,* 333 Mass. 252, 130 N.E. 2d 557 (1955); *Leeds v. Leeds,* 308 N.Y. 991, 127 N.E. 2d 845 (1955); see generally, Lindey. Separation Agreements and Ante-Nuptial Contracts, 15-75 (1967).

a want of consideration because she had been entitled to one-half of the checking account regardless of the agreement, for it was income from her own property.

Our Court, in upholding her claim, noted the following: ". . . One-half of the bank account, was already hers; it could not therefore be regarded as consideration passing under the agreement. The fact that the account stood on the books of the bank in the name of Morris Levine alone, plus his direction to the executors to pay one-half of the fund to Mrs. Levine, would not constitute consideration for her promise to refrain from claiming any part of his estate. Acknowledgement of what clearly belongs to another by law and equity cannot be advanced as consideration. . . . It is true that the agreement of 1949 was also under seal, but as to that agreement there was a failure of consideration for, as indicated, Mr. Levine specified what it was he intended to confer upon his wife in exchange for her abandoning all claims to any part of his estate. *But he could not give her what he promised, for the cogent reason that it was not his to give. It was impossible for him to pass to his wife what was already hers.*" Id. at 358-59, 118 A. 2d at 743. (Emphasis added.)

In the instant case, Julia and Alexander Ratony owned and sold the property in Coatesville as tenants by the entireties. Appellant was entitled to one-half of the proceeds as a matter of law. Hence, I fail to comprehend how her "agreeing" to waive her rights in his estate for one-half of those proceeds can be viewed as being supported by any meaningful consideration.

The majority urges that the "mutual" promises of Mr. and Mrs. Ratony to waive any interest they each might have in the other's estate serves as sufficient consideration for this agreement. I have already indicated that I do not accept the proposition that the Ratonys *mutually* exchanged such promises. Nor do I believe

that such an exchange alone is sufficient legally to sustain an antenuptial or postnuptial agreement. In *Campbell and Others' Appeal,* supra, it was stated: " 'Equity follows the law in this particular, unless equitable considerations in the given cause appear to modify the rule. For instance, where a postnuptial settlement altogether fair and equitable, has been executed and the gift to the wife has passed to her (for post-nuptial settlements, strictly speaking, are mere gifts between husband and wife: Schoul. Dom. Rel. 276), she might in that case in equity be required to perform it; in other words, a chancellor would refuse to restore her to her rights relinquished in the settlement, after the death of the husband. It will depend much, therefore, upon the nature and value of the interest which has been parted with by the wife as a consideration for what she has received by way of settlement, whether or not she ought to be entitled to relief; Cord on Married Women, sec. 35, *et seq. The authorities, as also the reason of the thing, seem to teach that . . . the wife . . . is never bound by a mere promissory consideration."* Id. at 306. (Emphasis added.)

The majority's proposition that Mrs. Ratony's acquisition of such things as "her absolute liberty" (she was still married), and "a right to a separate existence for her life without any interference from her husband, and (b) without any marital duties, such as the duty to cook or keep house" serves as sufficient legal consideration for this ambiguous agreement is certainly novel and without decisional precedent. I, for one, am unable to accept it.

I dissent.