Montague Estate.

Argued March 13, 1961. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and EAGEN, JJ.

*Paul E. C. Fike,* with him *Joseph N. Cascio,* and *Fike and Cascio,* for appellant.

*Archibald M. Matthews,* with him *Chad L. John,* for appellee.

OPINION BY MR. JUSTICE EAGEN, May 2, 1961:

Decedent's widow questioned the adequacy of the executor's inventory and appraisement of the estate; her exceptions thereto were sustained by the court below. The legal correctness of this order is now before us on appeal.

The decedent died June 1, 1957, after a long illness. He left surviving, his widow whom he married in 1934, a daughter by a previous marriage and three grandchildren. In 1948, he unsuccessfully sought a decree in divorce through court action. Although he was a man of substantial means, it was necessary for his wife, who was an invalid, to secure an order for support in the year 1949. This order was not complied with from the year 1953.

Upon various dates over a period of approximately three months immediately before his death, he assigned and transferred all of his interest and title in personal property of substantial value to a sister, Goldie Beachy, and her husband, Walter. The history of these transfers is described in the findings of the lower court to which no exceptions were filed. Important transfers

were made on May 24, 1957, eight days before his death. No consideration was paid and since the transfers involved nearly all of his assets, the remaining estate enjoyed very nominal value.

On March 27, 1957, the decedent executed and published his last will and testament, wherein he gave all of his estate to his brother-in-law in trust, with specific detailed instructions as to how the trust was to be administered for the benefit of his daughter and grandchildren. His widow, whom the will ignored, elected to take against it. She also filed exceptions to the appraisement and inventory of the estate, which the lower court sustained. It concluded that the transfers of the personal property, attempted by the decedent during his lifetime, were fraudulent and made for the purpose of defeating his widow's statutory rights in his estate. The evidence strongly supports this conclusion.

There is no doubt but that under the law of Pennsylvania, as well as the common law, a married man during his lifetime may dispose of his personal estate as he sees fit. He is the absolute owner thereof and his wife and children have no vested interest therein. Their right to his property attaches only at his death: *Benkart v. Commonwealth Trust Co.*, 269 Pa. 257, 112 Atl. 62 (1920); *Windolph v. Girard Trust Co.*, 245 Pa. 349, 91 Atl. 634 (1914). However, it is equally well established a married man cannot, without complete divestiture, dispose of his personal estate during his lifetime without his wife's consent with an intent to commit an actual fraud upon her rights: compare *DeNoble v. DeNoble*, 331 Pa. 273, 200 Atl. 77 (1938). In determining the question of intent, actual fraud is the indispensable foundation and it is not established merely by proving that the husband's purpose is to deprive the wife of her distributive share in his estate as widow. The "good faith" of the donor does not refer to the purpose to affect his wife, but rather to the in-

tent to divest himself of the ownership of the property: *Lines v. Lines,* 142 Pa. 149, 21 Atl. 809 (1891); *Beirne v. Cont.-Equitable T. & Tr. Co.,* 307 Pa. 570, 161 Atl. 721 (1932). Hence, it has been held that if a married man makes a gift of personalty during his lifetime in such a manner that the transfer is a colorable one and under such circumstances that he retains a concealed interest, or control, over the property, such a gift is fraudulent and will be set aside: *DeNoble v. DeNoble,* supra; *Cancilla v. Bondy,* 353 Pa. 249, 44 A. 2d 586 (1945). To be valid the gift must be made in "good faith" and with the intention to divest himself of the ownership in the property: *Windolph v. Girard Trust Co.,* supra.

In the instant case, the lower court found that the transfers involved were "not an absolute, unconditional gift thereof but that there was as between the donor and donees an esoteric understanding as to what was to happen to the several gifts in the event of certain contingencies." The burden of proving such, of course, was upon the widow. We are satisfied that this burden was fully met.

One of the transfers, for instance, involved a check in the amount of $15,000. This was assigned to the sister as "trustee." This and other transferred funds were kept by the sister and her husband in a separate bank account. Following decedent's death, monthly payments were made by the Beachys from this account to the decedent's daughter and grandchildren. A prior indebtedness of the decedent was paid from these funds. Is it reasonable to conclude that the decedent would deprive his daughter and grandchildren of all inheritance, when his will made very shortly before his demise indicated clearly an opposite intention? Why did he transfer to the Beachys title to the home and real estate in which his daughter was residing with her family, which he purchased and renovated specifically for

her use and benefit?   If these transfers constituted absolute and unconditional gifts, why did the decedent, a short time before his death, tell friends that "Goldie [his sister] was going to take care of his money" and that his daughter was taken care of?   Why did the Beachys, when asked to explain the circumstances incident to the alleged gifts, say they were made without any reason being given by the donor and without any request on their part for an explanation or even a "thank you" in return?   Is such testimony credible? These and many other circumstances disclosed by the evidence leads to the inescapable conclusion that these transfers were not unconditional and absolute and, therefore, under the facts presented were fraudulently made with the intent to conceal the donor's continuing interest and control over the property involved.

Appellant also contends that if no valid inter vivos gifts were effected and a secret understanding did, in fact, exist between the donor and the donees, that the transfers constituted the creation of an inter vivos trust which vested an immediate interest in the beneficiaries. With this, we cannot agree.   During the same period these transfers were consummated, the decedent's will was executed wherein he set up a trust, effective upon his death, in favor of his daughter and grandchildren with specific instructions as to the disposition of income and principal.   No payments were made to the beneficiaries until after his death.   The facts manifest clearly that the transfers were made with an accompanying retention of the power of disposition by will. Control continued during his lifetime.   Decedent's death was a prerequisite to the vesting of the beneficial interests.   This is a pure and simple testamentary disposition of the property involved to take effect after death.   The assets of such a trust must be surrendered to the decedent's personal representatives to be administered under the terms of his will subject to the elec-

tion of the widow to take against the will: *Pengelly Estate*, 374 Pa. 358, 97 A. 2d 844 (1953).

The decree of the lower court is affirmed. Costs to be paid by the estate.