Hahn Estate

*Wisler, Pearlstine, Talone, Craig & Garrity*, by *David M. Jordon* and *Michael J. Clement*, for executor.

*Smith, Aker, Grossman, Hollinger & Jenkins*, by *J. Brooke Aker*, for surviving spouse.

TAXIS, *J.*, July 11, 1978—This matter is before the court upon a request by Earle Hahn (Earle) as personal representative of the Estate of Arthur Hahn (Arthur), deceased, to strike the election of Sylvia Hahn (Sylvia) against the will and lifetime conveyances of Arthur. Also before the court are objections filed by Sylvia to the inventory filed by Earle.

Arthur died on June 18, 1973, survived by his son, Earle, by a first marriage, and his widow, Sylvia. Arthur and Sylvia were married on August 28, 1949, and on January 10, 1961 (eleven-and-a-half years later), Arthur and Sylvia signed a post-nuptial agreement. The parties were living together as husband and wife when this agreement was executed and continued to do so up until the date of Arthur's death.

After decedent's death, Sylvia filed her election to take against decedent's will and his inter-vivos conveyances and Earle seeks dismissal of her election, claiming that the widow is barred by the post-nuptial agreement. Sylvia, on the other hand, claims that the post-nuptial agreement is void and unenforceable because Arthur failed to make a full and fair disclosure of his assets at that time.

The post-nuptial agreement is presumptively valid and binding upon the parties thereto and in order to nullify or avoid or circumvent the agreement, Sylvia has the burden of proving the invalidity of the agreement by clear and convincing evidence that Arthur did not (1) make a reasonable provision for her at the time of the agreement, or (2) in the absence of such a provision, make a fair and full disclosure to her of his worth at that time: Hillegass Est., 431 Pa. 144, 244 A. 2d 672 (1968).

A reading of the agreement of January 10, 1961, clearly establishes that there is no provision made for Sylvia. A unique argument, however, is made by Earle that a reasonable provision for the wife can be contained in an instrument other than the post-nuptial agreement, provided it is made at the same time; that Arthur executed a will at the same meeting in which he signed the post-nuptial agreement; and that such will, the terms of which are unnecessary to recite here, does make provisions for Sylvia. This court concludes that the reasonable provision for the wife must be contained in the post-nuptial contract because then, if the post-nuptial contract is valid, the reasonable provision for the wife is enforceable. Arthur, however, provided for his wife in a will, which is of no value until his death, and then only if it is, in fact, his last will and testament. The reason for the rule that the reasonable provision must appear in the post-nuptial agreement is vividly demonstrated here because Arthur, before he died, executed a holographic will giving everything to his son, Earle, and revoking the will which had made provisions for his wife.

We now turn to the question of whether or not Arthur made a full and fair disclosure to Sylvia at the time of the signing of the agreement. See

Ratony Est., 443 Pa. 454, 460, 461, 277 A. 2d 791 (1971); Hillegass Est., supra.

It is true that paragraph 3 of the agreement states that: "Each spouse has disclosed to the other a full and complete statement of his or her assets and liabilities as of the date hereof, and such full disclosure is acknowledged by each of the parties as evidenced by the execution of this agreement." This clause is prima facie evidence that a full and fair disclosure of decedent's assets were made. Sylvia must prove the absence of full and fair disclosure by clear and convincing evidence.

Proof of clear and convincing evidence does not require proof beyond a reasonable doubt, although it does require proof greater than a mere preponderance: Ziel Est., 467 Pa. 531, 359 A. 2d 728 (1976).

Before a recitation of the testimony establishing the nondisclosure by Arthur, the court at this point rules that Sylvia's testimony as to nondisclosure is inadmissible under the Dead Man's Rule. See Vallish Est., 431 Pa. 88, 98, 244 A. 2d 745 (1968). The argument on behalf of Sylvia that the rule was waived by the production of other witnesses by Earle is without merit, and the court concludes that the production of these witnesses was not a waiver of Sylvia's incompetency. Cf. Moore Est., 439 Pa. 578, 266 A. 2d 641 (1970); Rosche v. McCoy, 397 Pa. 615, 156 A. 2d 307 (1959); Volkwein v. Volkwein, 146 Pa. Superior Ct. 265, 22 A. 2d 81 (1941).

Turning now to the testimony that bears upon the question of nondisclosure, this record establishes the following facts. Arthur sought assistance in the preparation of a will for himself and his wife and in the preparation of a post-nuptial agreement. Arthur called the Fidelity Bank, and James J. Coate, Esq.,

was assigned to the matter. Because Arthur did not want his personal attorney, Raymond Pearlstine, Esq., to have anything to do with the preparation of these instruments, Arthur instructed Mr. Coate to select an attorney, and John D. Lucey, Esq., was selected. The testimony of Mr. Lucey and Mr. Coate in points relevant here is important.

Mr. Coate was questioned about a copy (Exhibit R-87) of the post-nuptial agreement taken from the file of LaBrum & Doak, Esqs., which contained a page with (a) a date and signature place for Sylvia at the bottom, and (b) a statement at the top, "I acknowledge that the following assets of Arthur Hahn have been disclosed to me," the rest of the page being blank. The testimony was as follows:

"Q . . . On January 10, 1961, were the documents as signed by Arthur and Sylvia Hahn . . . with respect to whether or not there was attached to the document a last page for the signature of Sylvia Hahn concerning assets of Arthur Hahn?

"Was that page on the documents at the time of the signing?

"A . . . To my recollection, no, it was not . . .

"BY THE COURT:

"Q What is your best present recollection?

"A My best present recollection is that the page was not there, *but I can give some further explanation of that.*

"BY MR. AKER:

"Q Would you give your further explanation, then? . . .

"A . . . it was clearly stated by me to Mr. Hahn that these kinds of agreements, *without a revelation of assets, and attached as an exhibit to this kind of post-nuptial agreement* —that this kind of

agreement *could very well be unenforcible*, or ruled invalid, *because of failure to reveal assets*, and at that time it was sort of brushed off, like, 'Don't get into it any further. It's okay the way it is. *We will add that later.'*

"BY MR. AKER:

"Q   Brushed off by whom?

"A   By Mr. Hahn.

"Q   During the meetings with Arthur Hahn prior to January 10, 1961, was the document ever presented to Arthur Hahn with that last sheet that appears as a part of Exhibit R-87 presented to him for his consideration?

"A   I don't know if anything was presented to him by way of a writing. *He was certainly told that this had to be part of the agreement.*"

Both James Coate and John Lucey confirmed the fact that Sylvia had not been present at any of the meetings at which preparation of the post-nuptial agreement was discussed, and that Sylvia was never represented by separate counsel relative to the post-nuptial agreement. James Coate's testimony also establishes the fact that he had never made available to Sylvia any of the information concerning Arthur's assets; that Arthur never revealed his assets to Sylvia in any meeting which Mr. Coate attended; that he, James Coate, never discussed with Sylvia what her assets were and no sheet was attached to the post-nuptial agreement for a listing of Sylvia's assets; and that at the time the post-nuptial agreement was signed there was no discussion of the assets.

From Mr. Coate's testimony it is clear that the disclosure page was not a part of the agreement when the agreement was signed. Mr. Coate then

provided the explanation for the absence of that page. He had clearly stated to Arthur that the agreement could very well be unenforceable without a revelation of assets attached as an exhibit. The court is not suggesting that Arthur's assets had to be attached as an exhibit. The critical point is that Arthur was told by his advisor to reveal his assets and attach them as an exhibit and he brushed off the advice and said, "We will add that later." The evidence is therefore clear that Arthur did not make full and fair disclosure of his worth to Sylvia.

Arthur's subsequent actions are also convincing evidence that he did not make full and fair disclosure of his worth to Sylvia. As a result of Mr. Coate's advice to him, Arthur was aware that the post-nuptial agreement was unenforceable without a revelation of assets. And Arthur's subsequent actions establish clearly that he considered the agreement unenforceable. In April, 1973, Arthur signed an irrevocable trust agreement on the advice of Morris Gerber, Esq., that Arthur make "an absolute irrevocable gift with no strings attached, no income, no nothing." *The purpose of the gift was to limit his wife's share of his estate.* If the 1961 post-nuptial agreement was enforceable, there would have been no need for the irrevocable trust to limit his wife's share of his estate. Further, Morris Gerber asked Arthur about the post-nuptial agreement and was told by Arthur that the post-nuptial agreement never came into being.

One final matter must be discussed before passing on to other matters. One of the problems presented by this post-nuptial agreement is unique in that at the time this agreement was executed, husband and wife lived together for almost 12 years

and continued to live together as husband and wife until husband's death in 1973. Earle made a unique argument that because Sylvia and Arthur lived together for so many years, she knew, or had at her disposal the means to learn, what assets Arthur owned. Therefore, Earle argues, a fair and full disclosure was not necessary, for she knew about the worth of her husband.

The agreements discussed in the cases discussing full and fair disclosure in ante or post-nuptial agreements customarily were executed at a time shortly before or shortly after marriage, and usually, in each of these situations, the surviving spouse had little opportunity, if any, to learn the assets of the other spouse.

The argument presented by the son is ingenious only because at first blush it contains the color of some persuasion. However, there is, and the court so rules, a duty on the part of Arthur to affirmatively disclose his assets even though Sylvia may have had at her disposal the means at least to find out what his assets were, and what they were worth.

In the confidential relationship which certainly existed here, the cases require utmost good faith on the part of the spouse. Here, Arthur was instructed by his lawyers to make a full and fair disclosure, but he failed to display that "utmost good faith" required and brushed the subject aside. Arthur thus failed to measure up to the good faith required at the time this post-nuptial agreement was executed.

This affirmative duty to make full and fair disclosure is not to be confused with the burden of proof. Sylvia was required to prove by clear and convincing evidence that Arthur did not fully and fairly disclose his worth, and this burden she carried. Arthur's duty of disclosure, the absence of which

was proved by Sylvia, is an affirmative duty, and the court permits no inference that Arthur performed this duty of disclosure simply because the parties lived together for many years.

There is a further reason why an inference of performance of the duty of disclosure should not be drawn simply because the parties lived together for many years. If the court permits the inference that the deceased spouse must have disclosed his assets simply because the parties lived together for many years, such an inference might render the surviving spouse competent to testify in rebuttal. Cf. Kincaid v. Neil, 37 D. & C. 2d 17 (1965). Rather than permit a further exception to the Dead Man's Rule, the court rules that an inference of performance of the duty of disclosure is not to be drawn simply because the parties lived together for many years.

After considering all of the evidence, the court is satisfied, and concludes, that Sylvia Hahn has established, by clear and convincing evidence, that Arthur did not make a full and fair disclosure of his worth, and the post-nuptial agreement is therefore null and void and of no effect. We therefore turn to a discussion of the elective rights of Sylvia, the surviving spouse.

## HAHN REALTY, INC.

Sylvia claims that her election reaches the stock of Hahn Realty, Inc. notwithstanding the execution by decedent of an irrevocable trust designed to hold and administer all of decedent's stock in Hahn Realty, Inc. Preliminarily, however, the court must determine who are the shareholders of Hahn Realty, Inc. and the number of shares owned by each shareholder.

In 1970, Arthur, Sylvia and Earle agreed that the intention of the parties had always been that the shares of stock of Hahn Realty, Inc. would be owned 30 shares by Arthur, 5 shares by Sylvia, and 5 shares by Earle, and a minute was signed to that effect. These three shareholders then directed that the share certificates be issued and the certificates were issued, although they were not impressed with the corporate seal. The fact that the certificates were not sealed did not render the certificates invalid. Cf. Business Corporation Law of May 5, 1933, P.L. 364, sec. 610, as amended, 15 P.S. §1610; 18 C.J.S. 728, §262.

The charter of Hahn Realty, Inc. was then amended to change the capitalization to provide for a new Class B non-voting common stock, and new certificates were prepared with the voting common stock still to be held 30 shares by Arthur, 5 shares by Sylvia and 5 shares by Earle. Earle was also to pay $12,000 for 120 shares of Class B non-voting common stock, but never signed the subscription agreement. The old certificates were returned for cancellation, but the new certificates were never signed nor sealed.

By reason of the foregoing, the court concludes that Earle and Sylvia each owned 5 shares of Hahn Realty, Inc. and the remaining 30 shares were owned by decedent and were transferred to an irrevocable trust, dated April 27, 1973, which the court will now consider.

On April 27, 1973, decedent, Sylvia, Earle, Morris Gerber, Esq., and Richard Watt, Esq., met at Morris Gerber's office. Decedent had previously met with Morris Gerber and had directed him to draft an irrevocable trust agreement. Richard Watt was

then an associate of Morris Gerber and assisted him with the transaction.

The trust provides for the transfer by decedent of 30 shares of common stock of Hahn Realty, Inc. to Earle, Earle's wife, and The Fidelity Bank, as trustees, and empowers the trustees to accept stock contributed by others. Morris Gerber expected that Sylvia and Earle would transfer their shares of Hahn Realty, Inc. to the trust and prepared a stock power to be signed by Sylvia.

Morris Gerber explained all the documents and Sylvia stated that she would like an opportunity to review them with her lawyer, whereupon decedent became upset and stated that he wanted a divorce. Morris Gerber took decedent out of the conference room, calmed him down and then brought him back. Decedent then, in the presence of Sylvia, Earle and a notary public, concluded the execution of the trust agreement and the assignment of the stock certificate representing his 30 shares of stock in Hahn Realty, Inc. Earle signed the trust agreement as trustee, and his wife came to Morris Gerber's office the next day and signed the trust agreement as trustee. The trust agreement was never executed by The Fidelity Bank, which had declined to act as trustee. The American Bank and Trust Company accepted the corporate trusteeship on October 16, 1973.

Decedent executed the trust agreement and the agreement was executed by two of the trustees. Decedent signed the assignment on the back of the stock certificate representing his 30 shares of stock of Hahn Realty, Inc. and left the stock certificate with Morris Gerber, who considered himself to be the attorney for the trustees. The court finds that

the irrevocable trust agreement dated April 27, 1973, was validly created.

Sylvia argues that the irrevocable trust was not validly created for several reasons.

First, Sylvia claims that her failure to execute her stock power prevented the creation of the trust. The court finds no such condition with regard to the creation of the trust, and the trust expressly provides that "the trust is irrevocable, and the Settlor reserves no rights whatsoever." In fact, the trust agreement describes the trust res as 30 shares of common stock of Hahn Realty, Inc. Also, decedent completed the execution of the trust agreement *after* Sylvia declined to execute her stock power, and decedent's daughter-in-law went to Morris Gerber's office on April 28, 1973, to sign the trust agreement as trustee, after which Morris Gerber telephoned decedent to tell him that his daughter-in-law signed as trustee. Sylvia's execution of the stock power was not a condition for the creation of the trust. The evidence is to the contrary.

Secondly, Sylvia claims that the trust could not be effective until the corporate trustee agreed to serve. If the settlor has made a sufficient delivery of the subject matter of the trust, the trust is validly created at the time of the conveyance even though the person named as trustee has no notice of the conveyance and of the trust, and even though he disclaims when he learns of the trust: Scott on Trusts, §35, 32.3. And this is particularly true where one of several trustees disclaims: Scott on Trust, §35.3. In addition, decedent expressly provided that, "in the event the Fidelity Bank declines to act as co-trustee, then in such event the individual co-trustees shall appoint a corporate co-trustee," and thus intended that the individual co-

trustees would be qualified to act in their capacity as co-trustees even if The Fidelity Bank declined to act. Decedent, therefore, intended that the trust would be effective even if The Fidelity Bank declined to act.

Thirdly, Sylvia claims that the execution by decedent of the stock certificate for 30 shares of Hahn Realty, Inc. was ineffective since the certificate was not properly issued, not having been signed on the face thereof by corporate officers and not having the corporate seal affixed. The fact that the stock was not issued in accordance with technical requirements does not prevent its transfer to the trust. Cf. Ash Trust, 20 Fiduc. Rep. 353 (1969).

Fourthly, Sylvia claims that the trust was never created because delivery of the trust res was not accomplished. Sylvia argues that the trust res is described as "30 shares, common stock, Hahn Realty, Inc. Share Certificate No. A-4" and that this certificate was never issued. Certificate No. A-1 was for 30 shares of common stock of Hahn Realty, Inc. and it was the assignment on this certificate which was signed by decedent on April 27, 1973. It was Richard Watt's suggestion that the trust res be described as Certificate No. A-4 because that would be the certificate issued by the company and owned by the trustees as the result of the gift by decedent to the trust. Again, under the authority of Ash Trust, supra, even though the new stock certificate was never issued, delivery of the trust res was accomplished.

Finally, Sylvia claims that decedent considered the trust agreement as conditioned upon her transferring her 5 shares of Hahn Realty, Inc. to the trust, and that the proof of this condition is decedent's threat to Sylvia *after the meeting of April 27,*

*1973,* that if she did not sign the document by Monday (April 30, 1973), she would get nothing. This testimony of Sylvia, accepted under a reserved ruling, is inadmissible under the Dead Man's Rule. While Morris Gerber's testimony as to the events of the meeting of April 27, 1973, rendered Sylvia competent to testify as to the events of that meeting, she was not competent to testify as to purported conversations subsequent to that meeting.

By reason of the foregoing, the court finds that the irrevocable trust agreement dated April 27, 1973, was validly created and the 30 shares of Hahn Realty, Inc. formerly owned by decedent now belong to the trustees under the irrevocable trust agreement dated April 27, 1973.

The next issue concerning Hahn Realty, Inc. is whether it still owns the real estate leased to the Collegeville Inn Restaurant, and also the adjoining 17 acres.

Twelve days before decedent's death, a deed was executed from Hahn Realty, Inc. to Earle and his wife, the real estate described in the deed is the real estate leased to the Collegeville Inn Restaurant, and also the adjoining 17 acres. The deed recites a consideration of $300,000, $290,000 of which is a purchase money mortgage from Earle and his wife to Hahn Realty, Inc.

Sylvia claims that the transfer to Earle and his wife were invalid as to her and had no effect upon her elective rights. She contends that she is entitled to a one-half elective share in Hahn Realty, Inc., including as part thereof the real estate leased to the Collegeville Inn Restaurant, and also the adjoining 17 acres. Alternatively, she claims that Hahn Realty, Inc. is the corporate veil for Arthur

and the conveyance to Earle and his wife was to defeat her marital rights, and the real estate is therefore subject to her election.

Sylvia argues that the sale price of $300,000 was patently fraudulent; that since Earle was purchaser, shareholder, director and officer of Hahn Realty, Inc., and trustee of 30 shares of Hahn Realty, Inc., the transaction is invalid because of self-dealing and conflicts of interests; and that since Earle's wife was purchaser, officer of Hahn Realty, Inc., and trustee of 30 shares of Hahn Realty, Inc., the transaction was invalid because of self-dealing and conflicts of interest.

The court agrees that by reason of the self-dealing and conflicts of interest on the part of Earle and his wife, the transfer to Earle and his wife is invalid. Cf. Bolton v. Stillwagon, 410 Pa. 618, 190 A. 2d 105 (1963); Waldman v. Weisenberg, 26 Fiduc. Rep. 53 (1975). Accordingly, upon an appropriate petition, Earle and his wife will be directed to reconvey to Hahn Realty, Inc., the real estate leased to the Collegeville Inn Restaurant, and also the adjoining 17 acres.

With regard to Sylvia's contention that the transfer of the real estate to Earle and his wife is a conveyance to defeat her marital rights and that the real estate is therefore subject to her election, the court does not agree. Because the transfer of the real estate is invalid, the real estate remains the asset of Hahn Realty, Inc., which is owned 5 shares by Earle, 5 shares by Sylvia, and 30 shares by the trustees of the irrevocable trust of April 27, 1973. Since therefore the real estate was in no way owned by decedent, and since he was no longer a shareholder of Hahn Realty, Inc., the attempted con-

veyance is not a conveyance *by decedent or by his corporation* to defeat Sylvia's marital rights. The real estate is therefore not subject to her election.

•  •  •

## COLLEGEVILLE INN, INC.

Collegeville Inn, Inc. is the operating company which conducts the restaurant, food and liquor business on the premises leased from Hahn Realty, Inc. and Sylvia claims the right of election with regard to all shares of stock of Collegeville Inn. The court finds that Sylvia has no elective rights in Collegeville Inn because all the issued and outstanding shares of stock were owned, at the time of decedent's death, by Earle.

Sylvia contends that the estate owns 29 shares of Collegeville Inn because 29 shares were formerly owned by decedent and were never transferred by decedent, so that she has elective rights at least as to 29 shares. Prior to January 9, 1969, the authorized capital stock of Collegeville Inn had been 250 shares, and on January 9, 1969, the Commonwealth of Pennsylvania approved an increase in authorized capital from 250 shares to 500 shares. The purpose of the recapitalization was to enable original issue shares to be transferred to Earle so that Earle would have 49 percent of the stock, with Arthur remaining in control. Before determining the number of shares that should be transferred to Earle, the corporate stock book was examined and evaluated and it was determined that 29 shares should be retired, leaving 161 shares in Arthur's name. The 29 shares were therefore retired and Sylvia has no elective rights as to these shares.

Sylvia contends that issuance in 1969 of 160 shares of stock to Earle was a sham transaction, so that she has elective rights to 160 shares of Collegeville Inn. The evidence establishes that in 1968, or 1969, Earle subscribed to purchase 160 shares of stock of Collegeville Inn, that he paid for his subscription, and that the stock was, in fact, issued. Accordingly, Sylvia has no elective rights in these shares.

Sylvia argues that the issuance of 160 shares of stock was a sham because the transaction was concealed from her and the price for the stock was inadequate. Sylvia has established no right to have been advised of the transaction, nor has she established any basis to complain of the subscription price. Even as a married man, Arthur could dispose of his personal estate as he saw fit so long as he made complete divestiture: Montague Est., 403 Pa. 558, 560, 170 A. 2d 103 (1961).

Sylvia contends that the transfer of 161 shares of stock from Arthur to Earle as of January 2, 1970, is ineffective, so that she has elective rights to 161 shares of Collegeville Inn. The evidence establishes that in March 1973, a certificate was issued to Earle for 161 shares of stock, the result of a sale of such stock by Arthur to Earle. While the transaction was backdated to January 2, 1970, the court finds the actual date of the transaction to be of no consequence to Sylvia. Even as a married man, Arthur could dispose of his personal estate during his lifetime so long as he made complete divestiture: Montague Est., supra. Accordingly, whether the transaction took place in 1970 or 1973, and whether the sales price was inadequate, are of no consequence to Sylvia. Arthur's admitted purpose in

transferring the stock to Earle was his desire that Earle should own the Collegeville Inn, but such a transfer is not subject to Sylvia's elective rights unless Arthur Hahn retained a power of appointment by will or a power of revocation or consumption: Probate, Estates and Fiduciaries Code of June 30, 1972, P.L. 508, as amended, 20 Pa.C.S.A. §6111.

Sylvia argues that the transfer is subject to Sylvia's elective rights because the transfer was made in contemplation of death. While the transfer of the 161 shares was in contemplation of death, and while the admitted purpose in transferring the stock to Earle was Arthur's desire that Earle should own the Collegeville Inn free of any interest of Sylvia, the court has been cited to no authority, nor does the court find any authority, which holds that a completed gift of his personal estate by a married man *during his lifetime* is subject to the elective rights of his wife.

The shares of stock of Collegeville Inn are therefore not subject to the elective rights of Sylvia.

By reason of the foregoing, Sylvia is entitled to a one-half elective share of decedent's probate assets, net of administration expenses and debts, subject to any death taxes thereon. Green Meadows Farm and 2919 North 22nd Street are not subject to Sylvia's election, having passed to her as surviving tenant by the entireties. Decedent's interest in Hahn Realty, Inc. having been transferred to an irrevocable deed of trust during his lifetime, Sylvia has no right of election with regard to assets of Hahn Realty, Inc. And decedent's interest in Collegeville Inn, Inc. having been transferred during his lifetime, Sylvia has no right of election with regard to assets of Collegeville Inn, Inc.

## DECREE NISI

And now, July 11, 1978, the court dismisses Earle's request to strike Sylvia's election against decedent's will. In addition, the court hereby sustains Sylvia's eighth objection, to wit, the inclusion of the inventory of decedent's "partnership interest" in Green Meadows Farm, and the court hereby dismisses the remaining objections to the inventory.

This decree nisi will become final 15 days from this date unless exceptions are filed thereto.